L. E. WATERMAN CO. v. MODERN PEN CO.

(District Court, S. D. New York. January 25, 1912.)

1. JUDGMENT (§ 831*)—FOREIGN JUDGMENT—CONCLUSIVENESS—FINALITY.

A decree of a foreign court between the same parties for the same cause, which is not a final adjudication of all the matters in controversy in the suit in which it is entered, is not available as an estoppel.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1519–1522; Dec. Dig. § 831.*]

2. JUDGMENT (§ 650*)—FINAL DECREE—ESTOPPEL.

A judgment is not available as an estoppel until the court rendering it has finally parted with control over the decision.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1162; Dec. Dig. § 650.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 73*)—FAMILY NAME—RIGHT TO USE —TRANSFER.

W., after leaving complainant's employ, formed a partnership to engage in the manufacture and sale of fountain pens, using his own name in the firm name of "A. A. Waterman & Co.," and thereafter the business, good will, and name of the firm were sold to defendant's assignor. Held, that W. was entitled to use his own name as he did, notwithstanding the use of the same family name as a part of the name of complainant corporation, and that such right passed by the assignment to defendant.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 84; Dec. Dig. § 73.*

Right to use one's own name as trade-mark or trade-name, see notes to R. W. Rogers Co. v. Wm. Rogers Mfg. Co., 17 C. C. A. 579; Kathereiner's Malzkaffee Fabriken Mit Beschraenkter Haftung v. Pastor Kneipp Medicine Co., 27 C. C. A. 357.]

4. TRADE-MARKS AND TRADE-NAMES (§ 71*)—FAMILY NAME—USE—LIMITATION.

Complainant, "L. E. Waterman Company," had built up and established a business in the sale of fountain pens under the name "Waterman's Ideal." A. A. Waterman left complainant's employ and formed

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a partnership under. the name "A. A. Waterman & Co." and started to sell pens in competition with complainant. which were stamped "A. A. Waterman & Co.," and then transferred the assets, good will, and right to use the name of such firm to defendant. *Held* that, though defendant was entitled to sell pens under the name "Waterman," it was not entitled to use the word "Ideal" or "Waterman" at all, or the trade-name, "A. A. Waterman & Co." in the sale of such pens, except in connection with an equivalent of the phrase "not connected with the original Waterman pen."

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 82; Dec. Dig. § 71.*]

In Equity. Suit by the L. E. Waterman Company against the Modern Pen Company. Judgment for complainant.

Samuel S. Watson, for complainant.

Alexander S. Bacon, for defendant.

HAND, District Judge. The Circuit Court of Appeals (183 Fed. 118. 105 C. C. A. 408) has decided that there should be no absolute injunction against the name "A. A. Waterman & Co.," on the showing made. It is not therefore necessary to consider the question whether under any circumstances the court should altogether forbid a man from using his surname in a given business, and whether there may be cases where no accompanying phrase can prevent the result that the business of the first in the field will suffer by the competition of the second. Certainly the general rule is that such damage as so arises the victim must bear as an incident of competition. Further, the decision upon the preliminary injunction determined that upon the proof there presented the agreement of June 12, 1905, upon which the defendant depends, was not a mere sham, but was a reasonable part of the reorganization of the business of Fraser & Geyer Company, and it also determined that the old corporation of Fraser & Geyer Company with its attendant firm of A. A. Waterman & Co. had Waterman's right to use his name in the business. The testimony upon the final hearing is conceded to be substantially like that in the affidavits, with two exceptions: First, the decree of the Italian court in the suit of this complainant against the Chapmans and Cambrini; and, second, the testimony of the assignment to Rhodes Lockwood of Waterman's business on February 1, 1899.

[1] The first question is therefore of the effect of the Italian decree. Regardless of what should be its scope, it does not make an estoppel at all, because it is not a final decree, and only such a decree effects an estoppel by our law, even in the case of a domestic judgment. Brush Electric Co. v. Western Electric Company, 76 Fed. 761, 22 C. C. A. 543; Ogden City v. Weaver, 108 Fed. 564, 47 C. C. A. 485; Australian Knitting Co. v. Gormly (C. C.) 138 Fed. 92; Hills & Co. v. Hoover (C. C.) 142 Fed. 904.

[2] It is true that the reason for this rule is not perfectly plain, but apparently it is that no judgment should be treated as an estoppel until the court that renders it has finally parted with control over the decision. Per Lacombe, J., Walter Baker & Co. v. Sanders, 80 Fed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

889, 890, 26 C. C. A. 220. Thus, if a final decree be entered pendente lite, it is enough (Bradley Mfg. Co. v. Eagle Mfg. Co., 57 Fed. 980, 6 C. C. A. 661) and possibly, if appeal be taken, and the interlocutory judgment be affirmed (Bissell Carpet Sweeper Co. v. Goshen Sweeper Co., 72 Fed. 545, 19 C. C. A. 25).

If the rule is to be taken literally, it is enough that the Italian decree is confessedly interlocutory; if, on the other hand, the rule means that any decree is a good estoppel if the court that rendered it has finally parted with the power to revise it, then proof is lacking here, for the complainant must show that it is such a decree. The proof is silent upon that point. I do not forget that Accetta gave considerable testimony showing that, so far as concerned the right to use the name "Waterman," the decree was "final"; but so it would be "final" pro tanto in this country. That only means, I take it, that the court has disposed of that part of the dispute, and is retaining the cause for the incidental assessment of damages. It does not mean, at least in the United States it would not mean, that the court did not still retain power to recall the decree, just as indeed it has power till the term be passed, even over a final decree. That the Italian court could not revise the decree is not even suggested in the testimony, the whole of which concerned quite a different matter, i. e., whether the decree was a mere preliminary application analogous to a motion for a preliminary injunction, or whether it was the last action of the court necessary to a decision of the parties' rights. I have no doubt that the decree is the last judicial act necessary upon that branch of the case, but under our law that is not enough. I therefore lay aside the Italian judgment.

[3] The remaining question is whether the new testimony of the assignment to Rhodes Lockwood affects the defendant's right to the use of the name "A. A. Waterman & Co."

In 1897 Waterman left the complainant's employ, and soon after formed a partnership with one Gibson. They did business under the name of the "A. A. Waterman Pen Company" and "A. A. Waterman & Co." On September 3, 1898, the complainant procured an injunction against the use of the first of these names, but not the second. The firm at about this time entered into a somewhat vague relation with one Rhodes Lockwood, a pen dealer, and, eventually becoming financially embarrassed, they assigned the whole business, good will and name included, to Lockwood, to whom they were heavily indebted. Gibson became Lockwood's employé, and Waterman continued in a small way in business for himself under the name of "A. A. Waterman, Maker," from February, 1899, to June, 1899, when he took into partnership one Dewey, with whom he continued to do business as "A. A. Waterman & Co." for about 18 months, until the partnership of Fraser & Geyer. As the assignment to Lockwood of February 1, 1899, is lost, just what he got is uncertain; still he never attempted to use the name "A. A. Waterman & Co.," except upon pens or parts of pens which were already partly made on the day of the assignment. In short, he used his rights only to finish up the goods which he bought. Furthermore, he knew that Waterman was

making pens under his own name, and actually supplied him with pens so marked. Thus it appears that, whatever the exact words of the lost agreement, the parties treated it as in no sense giving Lockwood an exclusive right to use Waterman's name. I can only treat it as in fact giving such rights as the parties eventually accorded each other. Waterman continued the partnership with Dewey until January, 1901, and there is no suggestion in the record that during that time they did not do a real business under the name "A. A. Waterman & Co.," making it prosper as much as they could.

Now, so far as Lockwood is concerned, Waterman, who certainly had the right to use his name, could have given another as good a right to use the name as he had himself, as an incident of the sale of the business. When a business is sold with its old name, the right to keep on using it is perfectly well established, though the significance of the continued use of the name must perhaps be stated in rather general language. Kidd v. Johnson, 100 U. S. 617, 620, 25 L. Ed. 769. It is basis enough for some recognition of the right to continue the use of the name that the public believes that, though a business changes hands, there may be a continuity of the old habits, a likelihood of persistence in fair dealing, or in the same good standard of wares, which gives assurance to them, and is of value to its possessor. Perhaps the value comes from a tacit recognition of the inertia of original honest practices; perhaps, like "good will," it arises from the mere suggestibility of new customers and the fixed habits of old, who will buy upon a well-known name without more. But, whatever it be, the same does truthfully indicate some continuity, and that is not a deceit, though the actual person is gone whose name appears, and whose personality originated the very qualities which make the succession of value.

This being the case, a name is not something to be sold once, and the title then to be exhausted. All that can be sold is the right to designate the continued business as in fact the same, and I confess I do not see why, in the absence of covenants to the contrary, which it is true are generally implied, A. may not engage in the same business in his own name as that which he has already sold to B. and which B. continues to conduct under A.'s name. But if A. may start up a second business, surely he may sell it, as he might sell his first, and with it the right to keep his name which indicates that it is the same business. The new business which Waterman had started had its own customers, its own reputation, its own methods of business, and the only name which that business had after June, 1899, was "A. A. Waterman & Co." De facto, it did have a name then; de jure no one could gainsay it. It is irrelevant that there was another business still incompletely wound up, even though Waterman had been one of its founders.

Moreover, if Waterman had sold out his business direct to the corporation of Fraser & Geyer Company, they would have had the right to use the name upon the pens. Indeed, upon purchasing the business they might have made that their own name. Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U. S. 118, 25 Sup. Ct. 609, 49 L.

Ed. 972. It is of no consequence whether the assignee of an existing business is a corporation, a firm, or an individual. Therefore it is equally of no consequence whether the firm of Fraser, Geyer & Waterman was a mere subterfuge or not. At least, if it were not a real firm, that was because Waterman had sold out his business to the corporation and gone into its employ, and that he might do, and they might use his name. At most, all that the law forbids is that a corporation at the outset choose a name which imitates another's name. Once a bona fide business be started, another may buy it up and develope it as they can, just as a special partner might give it capital to develope it.

In the case at bar it does not seem to me to be open to any doubt that the whole purchase of Waterman's business and the preservation of the firm name had for its only motive the expectation that the Fraser & Geyer Company could by the resulting confusion pass off its goods under the cover of the complainant's reputation. My reasons for this are, first, Waterman's own very frank statement that throughout his connection with the enterprise the only serious inducement he could offer was the use of his name. Indeed, no other reason is suggested which could serve as any inducement to coalition with a man in Waterman's position at that time, one who had failed within two years, and, since his assignment to meet his debts, had been doing a small business in a town 250 miles away, which came into no competition with the Fraser & Geyer Company and brought nothing to its business.

Again, the obviously colorable character of all the contracts with Waterman show that they valued him chiefly for the right they got to use his name. At no time had he any substantial powers as a partner, and after December 12, 1901, he had no rights to any profits or anything more than a salesman's salary or a salesman's commissions. The elaborate efforts to keep up the formal appearance of a real firm with actual business connections with the real enterprise show that the parties thought that they could not avow what was their real intention, and the same efforts emphasize what that real intention was. Especially is this true when one contrasts the formal relations with the fact that neither firm ever did anything, actually, but keep a spurious existence upon its books. Surely the chief inducement to combine with Waterman was to get the use of his name. However, I do not think that this is in the least degree relevant to the rights which the Fraser & Geyer Company got by the transfer, for the question is of the effect of the competition, not its purpose or motive. Whatever part motive may play, and may be destined to play, in the law of torts, I know of no instance in which the legality of an act depends upon the actor's motives where those motives include his hope of personal gain. Motive has a just share in determining whether a man is in fact pursuing his genuine interests, and whether he is therefore acting on his "rights"; but when each party is obviously trying to increase his property, his estate, his "universitas," the mutual limitations of activity between them do not depend upon the motive, so far as I know, but upon the means they use to effect their intentions and

the results that ensue. Once it be conceded here that Waterman might in ignorance of the complainant's business have started a business under the name of "A. A. Waterman & Co.," and after learning the facts have developed it as he could, I think his rights are not different because he knew from the outset that a part of his profits, if successful, would be at the complainant's expense and through confusion with the complainant's wares, as I have no doubt he did think. If his only motive were to damage the complainants, the result might be quite different; so, also, if his only motive were to sell out as a blackmailer. Moreover, if the defendant and its predecessors could have bought innocently, they could have bought with a deliberate purpose of profiting at the complainant's expense. Such consequences are involved in the right to use the name and sell the business with the name.

[4] However, it does not follow that the right to use the name "A. A. Waterman & Co." is not subject to limitations. The record is full of evidence of the constant confusion which results from it, and since, as usual, the defendant extols its own wares and decries the complainant's, there ought to be no ground for protest at any measures designed to avoid a confusion which must be disastrous to the defendant's reputation and its trade. It should welcome anything, which, while it preserves its own chosen title in full, will serve to advise the public that they must not confound its superior goods with the complainant's. If it urges its superiority in good faith, the suffix which I shall suggest should be interpreted, at least by a buyer experienced in the business, as a voluntary disclaimer of an association disastrous to the manufacturer and deceitful to the public. There is plenty of authority for an injunction in this form. Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 200, 204, 16 Sup. Ct. 1002, 41 L. Ed. 118; Herring, etc., Safe Co. v. Hall's Safe Co., 208 U. S. 554, 28 Sup. Ct. 350, 52 L. Ed. 616; American Waltham Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141, 43 L. R. A. 826, 73 Am. St. Rep. 263; Walter Baker & Co. v. Sanders, 80 Fed. 889, 26 C. C. A. 220; Dr. A. Reed Cushion Shoe Co. v. Frew, 162 Fed. 887, 89 C. C. A. 577.

I do not interpret the opinion of the Circuit Court of Appeals as meaning to control the final form of any decree which should pass, but only as deciding that there could be no decree absolutely prohibiting the use of the name, "A. A. Waterman & Co." That court certainly meant to leave the general question of what relief might be granted to the testimony which might develop upon the trial of the cause. Now it is perfectly plain to any candid person that the ordinary buyer pays little attention to such prefixes as "L. E." and "A. A."—an inattention upon which it is quite clear to me the defendant's purchase of the name depended. Dealers will, of course, know the difference very well; but they are privy to the fraud. It is the form in which the wares come to the final buyer that counts, and, while the defendant is not responsible for the spontaneous representation of dealers, it must not so mark or dress its goods as to create, or aid in, any misapprehension by the buyers. Florence Mfg. Co. v. J. C.

Dowd & Co., 178 Fed. 73, 75, 101 C. C. A. 565; National Biscuit Company v. Baker (C. C.) 96 Fed. 135.

The public means by the "Waterman" pen the complainant's pen; indeed, so the defendant concedes, being punctilious to avoid that name without its prefix. But the public by that very fact looks no further than the name. For myself, although I have used such pens for years, I am sure that I should not have had the least suspicion but that an "A. A. Waterman" pen was a "Waterman" pen, and this record proves that many others have actually been so misled. Honest competition cannot exist until the defendant puts on its pens that they are not the original "Waterman" pens, which they are not. Therefore a decree will pass forbidding the use of "Ideal," of "Waterman," and of "A. A. Waterman & Co.," except in connection with the following phrase or its equivalent, all words to be written in letters of the same size, "not connected with the original 'Waterman' pens." Dr. A. Reed Cushion Shoe Co. v. Frew, supra.