CITY OF DETROIT *v.* VILLAGE OF HIGHLAND PARK.

1. MUNICIPAL CORPORATIONS—SEWERS AND DRAINS—INJUNCTION—DECREE—CITIES.

In a suit commenced in 1898 between the city of Detroit and the village of Highland Park, in which an injunction was asked to restrain the above village from connecting its sewer system with the Woodward avenue sewer of the city of Detroit, a decree was entered in the circuit court authorizing defendant village, under certain restrictions and limitations, to make a connection between the two systems. Neither party appealed from the decree. The natural drainage of the village of Highland Park

was through the city of Detroit, and by improvements and artificial obstructions the natural drainage was cut off so as to render it imperative that the village have an outlet in some manner, the city sewer system being the most convenient. Later, the city of Detroit, upon the basis of the decree, filed a supplemental petition praying for the right to connect the system of Palmer Park with that of the village of Highland Park, passing along the Woodward avenue route. During the intervening period of 14 years the village increased very largely in population and the natural growth of the city of Detroit combining with the increase in population of such village resulted in a dangerous and unhealthful condition of the sewerage, which proved inadequate. In 1913 the village filed a supplemental petition charging that intolerable conditions had arisen due to the inadequate drainage and that a public nuisance had resulted which should be remedied by an increase in the capacity of the sewer system of said city. A decree was entered ordering that the alleged nuisance arising from the insufficiency of the drainage be abated by increasing the size of the sewer at the expense of both parties, who were held to be jointly responsible for the unhealthful condition. *Held*, that such supplemental decree was within the jurisdiction of the court of equity and was justified by the evidence tending to show that a nuisance was created by the inadequacy of the provisions for such sewerage and for surface drainage.

2. SAME—RES JUDICATA—JUDGMENT—CONCLUSIVENESS OF DECREE —EQUITY.

*Held*, also, that the decree in the original proceeding acquiesced in by the city and not appealed from by either party became *res judicata* of the issues in the original suit.

3. SAME—INTERLOCUTORY ORDER—EQUITY—JURISDICTION—CONCLUSIVENESS.

Where the decree of the court in chancery reserved the power to the court to take further action upon a proper showing by either party to the suit based upon future changes in existing conditions of such a nature as to render the order of the court inequitable or unreasonable, it was not rendered interlocutory in its nature but was conclusive upon the parties as to the issues decided and findings made in relation thereto.

4. CONSTITUTIONAL LAW—EMINENT DOMAIN — EQUITY—DUE PROCESS OF LAW.

It was not a violation of the constitutional inhibition against taking property without due process of law for the lower court to enter an order requiring the city of Detroit to enlarge its sewer system to such a capacity as might be required for the sewerage and drainage of the village of Highland Park, a municipal corporation lying above the city and having no drainage through it, the decree requiring the village to bear its just proportion of the necessary expenses.

5. NUISANCES—ABATEMENT—EQUITY—ADEQUATE REMEDY AT LAW.

Under the general jurisdiction of the court of equity it has authority to restrain and abate a continued public nuisance, which because of its extent or nature is not open to abatement by legal means.

6. SAME—PRIVATE RIGHTS—HIGHWAYS.

It is not valid objection to a proposed sewer that it passed through a part of an adjacent township to which the owners had not given their consent, no objections on their part being shown and permission to make extension along the highway having been given by the township authorities.

BROOKE, C. J., and McALVAY and KUHN, JJ., dissenting.

Appeal from Wayne; Mandell, J. Submitted November 24, 1914. (Docket No. 169.) Decided June 7, 1915.

Petition by the village of Highland Park against the city of Detroit in a suit pending in which the city of Detroit was complainant and the said village of Highland Park defendant for an order of the court requiring the enlargement of certain connecting sewers and drains jointly used by petitioner and respondent. From a decree granting the prayer of the petition respondent appeals. Affirmed.

*Walter Barlow* (*Richard I. Lawson,* of counsel), for appellant.

*Alfred Lucking* and *Edwin S. Bartlett,* for appellee.

STEERE, J.  This is a supplemental proceeding in the above-entitled suit, which involves mutual rights and duties of the above-named municipalities in relation to their drainage and sewer systems. It was first at issue in 1898. Under the pleadings and proofs presented at that time the suit was heard, and the issues involved were tried out before the Wayne circuit court in chancery, in 1899, and decrees were thereupon rendered adjudicating the differences which had arisen under then existing conditions. From those decrees no appeal was taken by either party. They were acquiesced in, accepted, and acted upon by all parties in interest during the intervening years. Subsequent growth of population and civic development in the affected territory was such, however, that in 1913 the provisions for drainage and sewage facilities, which had been made and jointly used in harmony with the mandates of those decrees, became overtaxed and inadequate, resulting in unwholesome conditions, which were ultimately declared by the State board of health to be a public nuisance. Overtures by the defendant, village of Highland Park, proposing mutual effort to relieve the situation, not being favorably acted upon by the city of Detroit, the village filed a supplemental petition, on June 18, 1913, which was subsequently amended and, after answer, a hearing was had, resulting in a supplemental decree by the Wayne circuit court in chancery, determining and declaring that intolerable conditions had arisen, owing to inadequate drainage and sewage provisions for which the city and village were both responsible, and which amounted to a public nuisance, menacing the health and comfort of the citizens of the village and portions of the city, by reason whereof it was ordered and decreed that said nuisance be abated by an increased capacity of the jointly maintained sewer system previously provided, and that it be done ac-

cording to certain designated connections, alterations, and enlargements, or their equivalent. From this decree the city of Detroit has appealed, alleging numerous errors, and claiming broadly that the court had no jurisdiction to render such decree, because, briefly and collectively stated, Detroit is a separate, independent municipal entity having no legal connection with Highland Park, owns its sewers, which are a distinct and independent system within its boundaries, its own private property built for and by taxation of its own citizens, and therefore no power exists in the court to compel it to permit any connection of the sewer system of Highland Park with its system; that to do so would be, in effect, taking the city's private property for the public use of another corporation without authority or process of law—without even condemnation proceedings for adjudication of public necessity and compensation therefor—and consequently in violation of the Constitution.

Although it is conceded, or at least not disputed, that Woodward avenue sewer, which runs through both the city and village, is overloaded and a deplorable condition exists in that connection, menacing public health and demanding relief, it is charged by the city that the village is responsible for this, and the duty rests upon the latter to furnish relief by independent available ways and means, the village having no right to demand, and the city owing no duty to furnish, sewer facilities to meet the requirements of an increasing population of the village; while the village bases its claim for relief on mutual rights, duties, and obligations of the parties as fixed by former decrees of the court, and subsequently developed conditions for which both are responsible and which demand further joint action. The city of Detroit, as is well known, fronts upon and extends for miles along the Detroit river. The village of High-

land Park lies centrally back and to the north of the
city, adjoining it.    Woodward avenue, the central
north and south trunk thoroughfare of the city, is
continued under the same name through the village,
which extends north from the city limits 2 miles and
spreads three-quarters of a mile on either side of the
avenue, being about 1½ miles wide east and west,
and is a comparatively level area.    Beyond the north-
ern limits of the village, fronting Woodward avenue
on the west side, lies Palmer Park, a sewered, de-
veloped, and popular public park belonging to and
under control of the city of Detroit.    In 1898, though
its population was then comparatively small, High-
land Park had developed to a point where sewage
facilities were deemed desirable and necessary.    To
that end a contract for a sewer was let to one Hanley,
its outlet to be through the Woodward avenue sewer,
which the city had extended to its north boundary
line, with then ample capacity to meet the require-
ments of such connection.    The right to so connect
was asserted under a claim that the city had, by
changing grades, paving, and other of its public im-
provements, obstructed the natural sources of drain-
age for Highland Park territory and, in particular,
totally blocked that portion which formerly passed
southwardly and eastwardly through the city.    When
Hanley was about to make the proposed connection
with the Woodward avenue sewer at the boundary
line the city began this suit and obtained a temporary
injunction restraining him from proceeding until
further order of the court.    Pleadings were perfected,
and the suit brought to a hearing upon pleadings and
proofs taken in open court, followed by a decree ren-
dered June 26, 1899, authorizing said connection to
be made, with an adjustable gate near the city limits,
having an opening 18 inches in diameter, subject to
supervision of the city authorities, for which the vil-

lage was to pay $500 annually. In this original decree rendered after a full hearing in open court, with the right of the village to such drainage facilities through city territory the paramount question, and squarely put in issue by the pleadings, the court found, and stated, amongst other things, that:

"The natural drainage of the southerly part of the territorial limits of the village of Highland Park is southeasterly through the present territorial limits of the city of Detroit into Connor's creek, which empties into the Detroit river above the intake pipe of the Detroit waterworks; that more than 40 years ago this natural drainage was improved by the construction of ditches on each side of Woodward avenue leading into the Detroit river, and also by the construction of county ditches in part within the present territorial limits of said city leading from Woodward avenue in said city easterly to Connor's creek; that since the year 1890 some of these county ditches have been closed up and obstructed by the construction by the city of Detroit of a pavement on Woodward avenue to the city limits, and also by the construction of pavements on the lateral streets, and thereby the artificial drainage of the southerly part of the village of Highland Park has been cut off; * * * that the natural drainage of the northerly part of the village of Highland Park is to the easterly and northerly to Connor's creek; that more than 40 years ago this natural drainage was improved by the construction of a county ditch, known as the Wetmore ditch; that Connor's creek is a sluggish stream running through a nearly level country and the use of said creek by the village of Highland Park for sewage purposes would be highly detrimental to the public health of the city of Detroit and vicinity."

Based upon the inherent right to natural drainage and incidental to obstructions by the city of both natural and long-established artificial drainage which had been previously recognized and maintained without objection or interruption from an early period, and for the further reason that, even under then ex-

isting conditions and density of population, the use of Connor's creek for sewer purposes would imperil the health of the city of Detroit and vicinity, the court held and decreed that Highland Park, bearing its just proportion of the burden, was entitled to and must be allowed a drainage outlet to the Detroit river through the sewer system of the city, to the extent and on the terms before stated. The connection thus authorized was thereupon made and the drainage of the village thereafter carried through the Woodward avenue sewers. The city not only then acquiesced in and accepted this decree without appeal, but, having previously constructed a sewer system for Palmer Park, applied to the court by supplemental petition, setting forth that it was well known at the time of the decree, "and taken for granted by all parties, that said sewer was to be connected with and empty into a sewer which was then being constructed by defendant for the village of Highland Park," and asked for a decision of the court determining its right to the same, whereupon proceedings were had resulting in a supplemental decree, on December 28, 1899, granting said petition after a full hearing in open court with all parties represented. This supplemental decree, containing a finding of related facts and recital of reasons, based on mutual rights, interests, and equities of the parties, authorized connection of Palmer Park sewer with the Highland Park Woodward avenue sewer, and ordered both that such connection "should remain open its full size so as to carry said Palmer Park sewage," and "the 18-inch sewer connection, as heretofore decreed, should remain open, free of future toll, in payment of the city of Detroit's advantages, already mentioned, in connecting Palmer Park with sewer and water advantages." It was also provided that either party might, in the future, apply to the court for a further order or modification of this

decree as occasion might require. The sewage facilities provided at the time of or immediately subsequent to this adjudication of the matter were evidently not only adequate for existing requirements, but for a normal increase of population during many years, as it is conceded that the growth of Detroit and its environments, particularly in the vicinity of Highland Park, has been unusually great and rapid. In the decree here appealed from the trial court held and stated as to the old decrees of 1899:

"These orders and decrees of this court must be assumed to be correct and to be conclusively established, and that the village of Highland Park has a right to discharge its sewage through the sewers of the city of Detroit into the Detroit river, upon the payment of a proper and adequate compensation to the city of Detroit for the use of such portions of its sewers as are required for the disposal of the sewage of the village of Highland Park."

Although the orders and decrees referred to reserved in the court a power to take further action upon proper showing, and authorize either party to make application therefor as occasion might require, we think it was manifestly intended that such application could only be by supplemental petition on changed conditions, by reason of increased population or other causes which might later arise, and had no reference to those fundamental questions of fact and law, involving natural drainage, past events and then existing conditions which were squarely raised by the pleadings, fully litigated, and necessarily then decided. Subsequent events and more recent developments cannot disturb a final decree as to them, nor open the door for their relitigation. Though it has been said that the doctrine of *res adjudicata* in technical definition only applies to decisions in another suit, by an analogous, if not identical, principle applicable in such cases, and often by that name, the rule is

applied with like effect to decisions in a former stage of the same suit. Those decrees were in no sense interlocutory or merely incidental to the progress of the suit, but upon the questions raised, facts found and points decided were a full and final disposition of the case upon its merits, as matters then stood, were appealable, and ended litigation as to those issues unless reversed on appeal, and no appeal was taken. They cannot therefore be again called in question by the parties who litigated them, or those in privity with them, no matter in what form the question be presented. *McNeely* v. *Hyde,* 46 La. Ann. 1083 (15 South. 167); *Strike* v. *McDonald,* 2 Har. & G. (Md.) 191; *Younkin* v. *Younkin,* 44 Neb. 729 (63 N. W. 31); *Wales* v. *Lyon,* 2 Mich. 276; 23 Cyc. p. 1232.

The orders and decrees of 1899 were a final determination of the principal object of the suit and of the main facts put in controversy by the pleadings. The primary question raised and determined was the right of the adjacent village, for reasons alleged and denied, to discharge its drainage through the sewers of the city. It involved the questions of obstruction by city improvements of natural and long-existing artificial drainage facilities of the village through portions of the city, the menace to public health from enforcing its natural drainage into Connor's creek, which emptied above the intake of the city's water supply, and the sewage of Palmer Park, property belonging to the city and lying beyond the village; each of these questions, which, if left open, might prove a future fruitful source of trouble and litigation, were considered and adjudicated, with such apparent equity as to be acquiesced in without appeal, and acted under by the parties in interest for over a decade during a formative period of rapid development both in the village and contiguous portions of the city.

The rights and benefits conferred by that decision of the questions involved were mutual. We conclude, with the trial court, that the door is not now open to relitigate those questions then determined, and which have again been raised and argued in this proceeding, and do not deem it essential to review the proofs and authorities urged in that connection.

Neither the original decrees nor the one here appealed from contemplate that the city shall bear the burden of caring for the drainage of the village, beyond mutual adjustment of their systems to each other at the boundary line, and providing in the city system as constructed an enlarged capacity to meet the requirements of the village, at the expense of the latter. No extra burden of taxation is put upon the city, and none is asked by the village, which in over-tures for mutual action and in this litigation has consistently proposed to defray its just proportion of the cost of sewers jointly used.

It is claimed that the rapid growth of the village and resulting increased discharge of its sewage into the Woodward avenue sewer is alone the cause of its being overloaded. This is not borne out by the evidence. The most which can be said in that connection is that if either of the municipalities had not increased its sewage, the other might not alone have overtaxed the Woodward avenue sewer. Much stress is laid by its counsel on the rapid growth of Detroit, and in its defense the contention is made that the city's resources have been strained by pressing necessity of enlarging and extending its own sewer system, in an effort to meet imperative demands within its limits. It also appears that much of this expansion has been in the northerly portion of the city, along and upon territory on each side of Woodward avenue extending towards Highland Park. As a result various sewers, of large capacity, draining tribu-

tary portions of the city, have been connected with the Woodward avenue sewer since 1899. The finding of the trial court that both are responsible for existing conditions, and the found nuisance is jointly created and maintained by Detroit and Highland Park, is sustained by abundant proof.

It is shown that during the years before the present differences arose, the city, while expanding and enlarging its system to meet new demands, planned and carried on the same with reference, not only to the needs of outlying districts within its corporate limits, which might later require sewage facilities, but also to territory beyond its limits. In furtherance of that policy, whether mindful or not of what those early decrees foreshadowed, it planned and for over a year before this petition was filed was engaged in constructing, a large relieving trunk sewer, known as the Morrell street sewer, terminating at the city boundary west of Woodward avenue, with a diameter of $8\frac{1}{2}$ feet at that point. The chief engineer of the city did not appear as a witness in the case, but an assistant engineer named Day, who testified that he and McCormick, the chief engineer, had, in consultation over the sewer system of the city, looked ahead, planned, and provided for the prospective growth of Detroit and its environs, and talked over from time to time what ought to be done in case Highland Park should be brought into the city; also stated that in extending this large Morrell street sewer towards the northern city boundary in the direction of Highland Park, their plans were designed with a view to taking in tributary, outlying territory. In answer to the following question on cross-examination, he said:

"*Q.* All the time we expected Highland Park would join us most any time; you have known it and Mr. McCormick has known it, and you have been building with reference to it?

186 Mich.—12.

"*A.* Sure; we took all the territory into account as far as that was concerned."

In the early part of 1913 conditions had reached a point where necessity of action was so manifest that efforts were made by the village of Highland Park to secure amicable co-operation with the city of Detroit for a solution of the difficulty. Numerous requests were made and official communications exchanged without favorable results, the last communication from the village to the city being in June, 1913, when, the attitude of the latter remaining unchanged, this petition was filed. Being unsuccessful in securing co-operation with the city, the village, in an effort to solve the problem, secured the services of Prof. Hoad of the University of Michigan, an expert upon the subject, who, after a careful study of the sewer system of Detroit and the whole drainage situation with reference to it, evolved and presented a plan for relieving the burden of Woodward avenue sewer and the drainage of Highland Park and contiguous territory by connections with the Morrell street sewer, heretofore referred to, which the city then had under construction, and which in his opinion furnished ample capacity to care for all sewage proposed to be diverted into it, furnishing detailed data with computations of area, flowage, size, capacity, cost, etc. While the practicability, and engineering feasibility of this plan was not controverted, it was given scant consideration and not accepted by the city.

Pending these proceedings, and during a delay in their progress, the village of Highland Park by petition called attention of the State board of health to existing sewer conditions in the village and contiguous portions of the city, and to the proposed plan for relief which it had secured, requesting that the board investigate the same with reference to sanitary conditions and grant such relief as was within its power.

An investigation was made by the board and proofs taken, which resulted in two orders made under the provisions of Act No. 98 (Pub. Acts 1913) after a hearing duly had, in which it was found that the city and village, lying contiguous, constituted but one community of people; that the present sewer systems, jointly used and maintained in that locality, were overtaxed, resulting in unwholesome conditions, dangerous to public health, inimical to the inhabitants of both municipalities and to the public generally; that alteration and enlargement of said systems to relieve such conditions was an absolute necessity for protection of public health; thereupon recommending and ordering that the city of Detroit and the village of Highland Park, before the 15th of December, 1913, make provision for the relief of such conditions, and for apportionment of the expense necessary thereto, according to proposed plans projected by Prof. Hoad, or some other route or system of sufficient size and capacity to accomplish the ordered relief. The municipal authorities of the city resented this as an unwarranted interference with its municipal affairs, and declined to comply with said order of the State board of health, giving among other reasons the following:

"The State board of health has no power or control over the sewers of this city. * * * We believe the people of Detroit are as well able to judge of their needs or their wants as any board or body composed of any number of men who reside outside its limits. * * * The people of Detroit builded this city for themselves. Let other municipalities do likewise if they wish to enjoy the fruits of labor, brain, and money.

"Some of the arguments which were advanced at our hearing would lead one to believe that the city of Detroit was incapable of managing its own affairs and governing itself."

Without rehearsing at length the protracted proceedings before the Wayne county circuit court in chancery, it is sufficient to state generally that an exhaustive hearing was had, and original testimony heard on all questions involved. Independent of the findings and orders of the State board of health, the court, in a lengthy decree, with full recitals and findings of fact, determined from the testimony then produced that existing unsanitary conditions in that locality, for which both parties were responsible, constituted a public nuisance which menaced the health of that community, and decreed that it must be abated. In said decree the court, as authorized by statute, also reviewed the recommendations and orders of the board of public health, determining from the testimony that its findings were well supported in fact and its recommendations feasible of execution, affirmed its orders, and decreed their execution. Act No. 98 (Pub. Acts 1913), "providing for the supervision and control by the State board of health over waterworks systems and sewage disposal systems," etc., authorizes its recommendations and orders to "be reviewed or enforced by any court of chancery or other court having jurisdiction." Section 11 of said act authorizes said board, on finding inspected sewer systems, or any part thereof, dangerous to individuals or the public health generally, to require, on its order, "such alterations in such systems as may be required or advisable in the opinion of such board," not, however, "to prevent any municipality now disposing of its sewage into any river, from continuing so to do."

The contention that the city's sewers may not for any reason be used for any purpose without its consent, because they are its private property, was, as before pointed out, adjudicated to the contrary after full hearing 15 years ago, in a final decree not ap-

pealed from. While counsel's argument for a review of that decree cannot be recognized, it is further urged in that connection that by it the rights and privileges to the village were restricted to use of an 18-inch connection with the Woodward avenue sewer, beyond which the decree is of no significance, and that it is neither controlling nor authority for the court to make further appropriation of the city's private property to meet increased demands of the village. In considering this contention, it is to be borne in mind that the court then found, in view of the contiguity, interlocking interests, and close relations of these two communities, as shown, that the welfare of both would be best conserved by carrying the drainage of the village from the artificial boundary line between them through the city's drainage system to the Detroit river, and so decreed because access to previously used artificial and natural drainage courses were obstructed by improvements already made, and which inevitably resulted from the location and growth of the city, because resort to such natural drainage as might be reached would contaminate the water supply and menace the public health of the city, and for the further reason that the city desired drainage facilities through the village for Palmer Park. Not only were the relations, rights, and duties of the parties then determined according to immediate needs, but manifestly in anticipation of their continuation for years to come. The reasons then moving the court to so decide and provide have continued with increasing force. The conditions which have led to this application but emphasize them. In determining what equity demands at this time and what relief is within the power of the court to grant, what was adjudicated on this subject as to the mutual rights and duties of these parties 15 years ago, and the course pursued by them in compliance with such

adjudication, are potent considerations which must be recognized. A nuisance may result, not only by reason of doing some wrongful act injurious to others, but also by omitting to perform some duty.

Of the transcendent power in an equity court, under its general jurisdiction, to restrain and abate a continuing public nuisance for which, by reason of its extent and nature, there is no plain and adequate legal remedy, there can be no question. Joyce on Nuisances, § 416.

That a public nuisance of serious magnitude, presenting a strong and mischievous case of pressing necessity, has developed and is increasing in that community as a result of overloading Woodward avenue sewer, which serves a central and densely occupied portion of the city, Palmer Park, belonging to the city, and Highland Park, between the two, is not seriously questioned. As applied to that line of sewerage the evidence is abundant, and conclusively sustains the findings of the lower court:

"That since 1899 the city of Detroit and the village of Highland Park have had and used connecting and common sewers, * * * and the sewers of the village of Highland Park and the sewers of the city of Detroit are connected together and constitute one system; * * * that the natural drainage of Highland Park is through Detroit to the Detroit river. * * * That the city of Detroit and village of Highland Park are contiguous, and constitute in fact but one community of people. * * * That a public nuisance is now maintained by the city of Detroit and village of Highland Park jointly by the overloading of the Woodward avenue sewer," etc.

We are unable to accept, as supported by authority or sound in principle, the contention that a court of chancery is powerless to order and direct abatement of such a jointly maintained nuisance by decree against all parties contributing to it, because that

portion of Woodward avenue sewer within its corporate limits is private property of the city; therefore the existing nuisance may continue while the recriminating and opposed parties responsible for it try out their differences according to ancient forms of wager of battle in an endurance test of each other's olfactory nerves and ability to survive unsanitary environments. That the court properly decreed the nuisance must be abated by the responsible parties we are well satisfied. Private ownership of the sewers only becomes material in connection with the remedy directed.

This brings us to the question of whether the directed remedy for abatement of the nuisance promulgated by the State board of health was beyond the power of the board and court. Danger to public health, the basis of authority by which the board and court assumed to act, has always been regarded as sufficient ground for exercise of police power legislation and court adjudication on matters reasonably essential to guard against such danger. Act No. 98 (Pub. Acts 1913) is legislation to that end, well within the police power of the State. That such legislation may provide for State agencies, in the form of boards or commissioners clothed with large discretionary powers to carry out the provisions and purposes of the enactment, is supported by abundant authority. *Kingman* v. *Sewerage Com.*, 153 Mass. 566 (27 N. E. 778, 12 L. R. A. 417); *Vancleve* v. *Sewerage Com'rs*, 71 N. J. Law, 183 (58 Atl. 571); *City of New York Health Dept.* v. *Trinity Church*, 145 N. Y. 32 (39 N. E. 833, 27 L. R. A. 710); *Woodruff* v. *Catlin*, 54 Conn. 277 (6 Atl. 849); *Prince* v. *Crocker*, 166 Mass. 347 (44 N. E. 446, 32 L. R. A. 610); *Henderson Bd. of Health* v. *Ward*, 107 Ky. 477 (54 S. W. 725); *Davock* v. *Moore*, 105 Mich. 120 (63 N. W. 424, 28 L. R. A. 783).

Counsel contend that the remedy ordered is in contravention of the Constitution, because it proposes to take and appropriate private property of the city for the benefit of those residing outside its corporate limits without due process of law and just compensation therefor. In support of this contention a line of authorities in this State is cited, beginning with *City of Detroit* v. *Corey*, 9 Mich. 165 (80 Am. Dec. 78), and ending with *Ostrander* v. *City of Lansing*, 111 Mich. 693 (70 N. W. 332). As against the police power of the State, applied to protecting public health, we do not think the authorities cited establish the contention that sewers are purely private property. Those cases relate primarily to liability of municipalities in contracts, or in negligence cases or allied matters where questions of public health and police power are not involved. In such cases, as contradistinguished from public improvements of general governmental concern, cities' sewers are their private property. In 1 Dillon on Municipal Corporations (5th Ed.), § 116, the distinction is pointed out in this language:

"But this statement [that waterworks, gas plants, sewers, etc., are private property of the city] is intended merely to embody the fundamental principle of the law upon which the rights of the municipality as a contracting party with another, or for liability for negligence, are to be determined."

In *New Orleans Gas Light Co.* v. *Commission*, 197 U. S. 453, 25 Sup. Ct. 471, where the gas company, though acting under a franchise from the city, was compelled by a public drainage commission, at great expense, to remove its pipes in order that a sewer tunnel could take their place, the court said:

"The drainage of a city in the interests of the public health * * * is one of the most important purposes for which the police power can be exercised. * * * Uncompensated obedience to a regulation

enacted for the public safety under the police power of the State is not a taking of property without due compensation."

In *Vancleve* v. *Sewerage Com., supra,* this question was squarely raised and thus disposed of:

"We are not willing, however, to assent to the notion that the municipal sewers, * * * are held by the city as private property in such sense that the legislature cannot impair the city's rights therein without compensation. * * * The constitutional provision that private property shall not be taken for public use without compensation has no applicancy."

What is here ordered by the court is incidental to the abatement of a nuisance, and is not a constitutional taking of property, to the exclusion of the owner from all use and possession of it and an actual assumption of exclusive ownership, possession, and control over it by the party in whose favor it is condemned and taken from the original owner at the end of a judicial determination. What the city is directed to do, or ordered to permit, in this case is more in the nature of a measure of its responsibility for the nuisance imputable in part to it; furthermore, in an equitable adjustment of responsibility between those jointly culpable for the nuisance, the court imposes upon the village the burden of paying the city for any benefits which incidentally result to it from the method prescribed for abating said nuisance.

In this connection it is well to note what "taking" the directed remedy for this nuisance contemplates, bearing in mind the vested rights and mutual obligations formerly adjudicated, under which the sewer operations in the affected district have obtained for nearly a decade and a half. The order does not deprive the city of any ownership, possession, control or needed present use, nor prospective so far as

shown, of any of its sewers; compliance with it calls for no expenditure of money by the city beyond that already voluntarily made or assumed, and imposes upon it no burden of debt or taxation. It provides for a diversion to relieve the Woodward avenue sewer outlet of the flow from Palmer Park and Highland Park, to the much larger and less burdened Morrell street sewer, entirely at the expense of the village. It only requires of the city that it allow connection to be made at the city boundary, where this sewer terminates with a size of 8½ feet, providing ample capacity for tributary territory beyond. It requires the village to pay the city of Detroit over $86,000 for this connection and to assume the entire cost of constructing through its own territory and that of Greenfield township, permission for which has been granted by the latter, a trunk sewer 2½ miles in length running from Woodward avenue sewer in Highland Park westerly and southerly to the north end of Morrell street sewer, to be constructed of a size to care for present and prospective requirements of the territory through which it is built and which is naturally tributary to it, the city of Detroit to have full control of the same, except a capacity requisite for the village and Palmer Park, and the village is also required to surrender its right to the use of Woodward avenue sewer.

Counsel for the city cite *Attorney General* v. *City of Grand Rapids*, 175 Mich. 503 (141 N. W. 890, 50 L. R. A. [N. S.] 473, Am. & Eng. Ann. Cas. 1915A, 968), quoting what is there said to the effect that no prescriptive right exists to create or maintain a nuisance, and urge that an affirmance of this decree would be a reversal of that case. The issue there involved was the right of a municipality to create a nuisance by pollution at a point where its sewers discharged. Here both these parties are discharging

their sewage into the Detroit river, one of the large connecting channels or straits of the Great Lakes. The statute under which it acted prohibits the board of health from preventing this, and no attempt has been made by the board or court to do so. The locality of the nuisance in issue, for which both municipalities are found jointly responsible, is nearly four miles away from the Detroit river. No prescriptive right to create or maintain a nuisance is claimed, and no riparian owner on the Detroit river, unless it be the city itself, the principal offender if it be an offense, raises any question as to its use by these municipalities being legitimate and reasonable. We find nothing in that case controlling this.

Objection is also made to the decree as unauthorized because it contemplates that the connecting sewer to be built by the village passes in part through Greenfield township, and adjoining proprietors are not shown to have given their consent. Neither are they shown to have objected. Permission to extend this sewer along the highways was given by the township authorities. The city cannot be heard to complain on grounds which only affect others who do not object, and the burden of carrying this sewer to the connection at the city limits is upon the village. We infer its failure to reach that connection would not be a serious grievance to the city.

We do not find counsel's contention that the Morrell street sewer is or will be needed to its full capacity for drainage of territory within the city sustained. The weight of the evidence is to the contrary, and well supports the finding of the court that the proposed connection can be made—

"with entire justice to all interests concerned, and without damage or injury to anybody or any interest, and without depriving any other portion of the community of adequate and proper sewer facilities."

The construction of Morrell street sewer of large capacity, carried to the city boundary line with reference to meeting the prospective needs of territory lying beyond, appears to be in harmony with a not unwise policy pursued by the city in planning and developing its sewer system. Numerous instances are shown by the proofs, including city records, in which private owners of subdivided outlying territory, some of it even within the limits of Highland Park and adjacent municipalities, have been allowed to connect their sewer systems with convenient terminals of the Detroit system at its boundary lines, on payment of an agreed price, or by other arrangements mutually satisfactory. Such privileges were granted to the three villages of Grosse Pointe, Grosse Pointe Park, and Grosse Pointe Farms by one resolution of the common council. It does not appear that in any of these cases any question of vested right or legal duty was involved. It is to be conceded that those transactions in themselves are of little legal significance here; neither are the motives which actuated such course important, nor are those charged in recriminations between these parties touching the refusal of the city to entertain overtures for like treatment of Highland Park, but those facts tend to show that the city's sewer system was planned and built with a capacity and with the view to accommodate outlying territory, thus furnishing the court some side light on the feasibility of the course here directed, while the prices actually paid for such privileges have some evidential force in aiding an equity court to determine the proper measure of compensation when apportioning responsibility for this public nuisance; they also tend to throw a shadow on the evidence and insistent protest of the city that connection with Highland Park as contemplated would prove so disastrous to the

city's projects and plans for future development of its sewer system as to be unthinkable.

Serious complaint is made of that portion of the decree fixing the amount which the village must pay to the city for use of Morrell street sewer. The city's evidence is very meager upon that subject, having been chiefly centered upon other contentions, and the decree adopted the figures of Prof. Hoad, who proportioned the amount on the entire cost of Morrell street sewer and the connecting sewer beyond, to be built by the village, treated together as a single system built in combination by the two, estimating the percentage of sewer capacity the village would require. While no direct evidence was given to contradict the estimates and method of arriving at results, it is urged that the method is but theoretical, based on estimates only, and unfair in consideration of the benefits received by the village. In view of the primary object of this suit and the uncertainties entering into this percentage method, which in a sense puts these parties together as partners in the project, we think the first impressions of the chancellor upon this question are less theoretical and more equitable. In orally announcing a decision at the close of the hearing the court expressed the view upon this branch of the case that for connecting with the Morrell street sewer the village should be required to pay the city what the proofs showed had been uniformly paid by outlying districts for such privilege. It is to be borne in mind in this connection that Prof. Hoad was employed by the village to work out a solution of this problem, and the village had proposed his plan to the court. The condition of the evidence relegated the court to testimony introduced by the village for any definite data as to what would be equitable for the village to pay. It was shown that others outside the city had paid for the privilege of sewer con-

nection at the city boundary one-half cent per square foot, a price which such parties were willing to give and the city willing to take, including even some territory within the limits of Highland Park.

Prof. Hoad frankly stated on cross-examination that, while he had endeavored to consider all interests and make a fair, just, and equitable basis, yet, called upon to separately consider the selfish interests of Highland Park, he regarded it as a favorable method for it. He further stated that, besides computing this item on a percentage basis of the whole cost, he also worked it up on the acreage basis, at one-half cent per square foot, which seemed to have been the price paid by others; that on the acreage he had first taken, it amounted to very nearly the same, but, taking what he afterwards ascertained was the correct acreage of Highland Park, it would be practically one-fifth higher by that method than by the method he adopted. The adopted sewer through Greenfield township took into consideration possible third parties, being planned with reference also to other outlying territory to be drained. While Highland Park proposed and consented to this, the city has not.

The primary purpose of this decree and ground for equitable interference in the differences between these neighboring municipalities is the abatement of a public nuisance which they have created, inimical to public health. We are impressed from this record as a whole that in proportioning the responsibility and directing an abatement of such nuisance, an award from the village to the city for benefits incident to the sewer connection ordered on an acreage basis is simpler, more practical, and more equitable than the one adopted, and finds equally satisfactory evidential support in the testimony. In determining this amount, acreage within the limits of the village

which by private arrangement has already paid should be deducted.

With this modification the decree is affirmed, without costs to either party.

STONE, BIRD, and MOORE, JJ., concurred with STEERE, J.

BROOKE, C. J. (*dissenting*). I find myself unable to agree with the conclusions reached by my Brother STEERE in this case. The decree of the court below went upon the assumption that the nuisance complained of is jointly created and maintained by the city of Detroit and the village of Highland Park. This is said by my Brother STEERE to be "sustained by abundant proof." In my opinion a careful reading of the record demonstrates that the nuisance complained of is due entirely to the excessive amount of sewage thrown into the Woodward avenue sewer by reason of the development in the village of Highland Park.

The witness Peter Dunn, superintendent of sewers for the city of Detroit, said:

"The big Woodward avenue sewer is being overtaxed by the Highland Park sewers, which are causing the trouble."

Thomas W. Aston, a resident of Highland Park, testified:

"There is a great deal more demand now on the sewer on Woodward avenue in Highland Park than there was in former years, and undoubtedly the increase of population of the village of Highland Park and the large increase in the number of dwellings and stores in Highland Park has made a greater demand for the use of the Woodward avenue sewer. Since that increased demand has been occasioned for the use of the Woodward avenue sewers, these conditions that I have described here on the witness stand have occurred."

John L. Austin testified:

"*Q.* You know as president of Highland Park, and your board of trustees of Highland Park knew at that time, that the Woodward avenue sewer in the city of Detroit was used to its full capacity at that time?

"*A.* I could not say whether we knew it except as the results in Highland Park in times of storms would show it.

"*Q.* The results in Highland Park in times of storm would indicate that the Woodward avenue sewer in the city and in Highland Park was taxed to its capacity?

"*A.* Yes, sir; it was understood and generally conceded to be in that condition.

"*Q.* What you have to have now is some other sewer outlet to meet the needs of Highland Park other than the Woodward avenue sewer?

"*A.* Not necessarily; there is sufficient in Woodward avenue; if the tax on it in Detroit was relieved, it would take care of our needs.

"*Q.* You mean if the city of Detroit would build other sewers to relieve the territory that now drains into the Woodward avenue sewer you would have enough capacity through the Woodward avenue sewer to take care of your village?

"*A.* Either that, or relieve the congestion from Woodward avenue into other sewers which are already built?

"*Q.* That is the impression you have?

"*A.* Yes, sir; in other words, the Woodward avenue sewer in the city of Detroit; there is not sufficient sewer capacity coming out of Highland Park to take care of the population and the need and relieve it without leading into some other sewer or dividing it up; in that way it could be taken care of."

Milton Ford, clerk of the village of Highland Park since 1902, testified:

"The real result is now that Highland Park has increased in population and public improvements in the nature of pavements and sewers until the Woodward avenue sewer will not accommodate the inhabitants of the village and drain their property.

"*Q.* And at the rate the village is growing there is still need of additional sewers and pavements?

"*A.* Very much indeed.

"*Q.* That is general throughout the village, is it not?

"*A.* It is, yes; where sewers are already in they are inadequate, and there is a large territory that is not sewered, and cannot be sewered until we find an outlet for the sewer, and this territory needs to be sewered. That is really the condition of affairs of the village; that is the condition that they are in at the present time."

That the Woodward avenue sewer is ample to care for all the sewage tributary to it within the limits of the city is not open to question. Since 1899, there has been comparatively little development within the limits of territory which drained into that sewer. By this I do not mean that there has not been a great deal of building in that territory, but with very few exceptions, the entire district was at that time covered with sewers having their outlets into the Woodward avenue sewer. If the sewage now received from the village of Highland Park at the city limits were rejected, there would be no nuisance arising from the overloading of the Woodward avenue sewer within the city. I am therefore firmly of the opinion that both the learned circuit judge who heard the case and my Brother STEERE are in error in holding that the city of Detroit is jointly responsible for the maintenance of a nuisance.

Proceeding upon this assumption my Brother STEERE next holds that the decree of the court below should be affirmed in principle because the questions involved are *res adjudicata.* Let us see exactly what the earlier decrees were:

"After due deliberation upon the pleadings and proofs and the arguments of counsel, it is ordered, adjudged, and decreed that the natural drainage of

186 Mich.—13.

the southerly part of the territorial limits of the village of Highland Park is southeasterly through the present territorial limits of the city of Detroit into Connor's creek, which empties into the Detroit river above the intake pipe of the Detroit waterworks; that more than 40 years ago this natural drainage was improved by the construction of ditches on each side of Woodward avenue into and through the city of Detroit to a sewer in Woodward avenue leading into the Detroit river, and also by the construction of county ditches in part within the present territorial limits of said city leading from Woodward avenue in said city easterly to Connor's creek; that since the year 1890 some of these county ditches have been closed up and obstructed by the construction by the city of Detroit of a pavement on Woodward avenue to the city limits, and also by the construction of pavements on the lateral streets, and thereby the artificial drainage of the southerly part of the village of Highland Park has been cut off.

"It is therefore adjudged and decreed that the village of Highland Park may connect its Woodward avenue sewer with the Detroit sewer at the city limits for the purpose of carrying off the water that falls upon the southerly portion of the territorial limits of said village, and, incidental to this right of natural drainage, the village of Highland Park has the right to make use of its said sewer for the purpose of carrying off the sewage from the dwellings and premises situated in the southerly part of said village.

"It is further adjudged and decreed that the natural drainage of the northerly part of the village of Highland Park is to the easterly and northerly to Connor's Creek; that more than 40 years ago this natural drainage was improved by the construction of a county ditch, known as the Wetmore ditch; that Connor's creek is a sluggish stream running through a nearly level country, and the use of said creek by the village of Highland Park for sewerage purposes would be highly detrimental to the public health of the city of Detroit and vicinity.

"And it is further adjudged and decreed that until the further order of this court the village of Highland Park, as to the northerly portion of said village may be permitted to use said sewer for sewerage purposes

in connection with the residences and premises of the inhabitants situated within said northerly portion of said village, provided, however, that the water flowing in said Wetmore ditch is not turned into said sewer; and, provided, further, that an adjustable gate be put into the Highland Park sewer near the city· limits of the city of Detroit, said gate to have an opening in it 18 inches in diameter, or the equivalent thereof, and this gate shall be subject at all times to the supervision and control of the board of public works of the city of Detroit, for the purpose of holding back the water in said Highland Park sewer if it should be necessary to do so in order to keep said Woodward avenue sewer, in the city of Detroit, from overflowing with water to the injury of the adjacent property owners; and provided, further, that the use of said sewer by the village of Highland Park and its inhabitants, and the provisions of this decree, shall be subject to the future orders and direction of this court, upon the application of either the city of Detroit or the village of Highland Park."

The supplemental decree contained the follow language:

"The decree will remain open, and subject to revision when new conditions arise, and the connection will still remain under the control of the city of Detroit. * * * It is further ordered that either party may apply to the court for a modification of this decree at any time in the future as occasion may require."

What did the court determine by its decree made in 1899? It determined, in the first place, that the southerly portion of the village of Highland Park had a natural drainage across the northeasterly corner of the city of Detroit into Connor's creek, and that this natural drain had been interrupted by improvements within the city of Detroit. It determined, secondly, that the northerly portion of said village drained north and east naturally into Connor's creek. The relative area of these two portions of the village

is that the portion draining to the north is three or four times greater than the portion draining to the south, and even that portion never drained south to the river along Woodward avenue, but, after coming into the city three or four blocks, went directly east to Connor's creek, so that at no time did any territory lying within the limits of the village of Highland Park ever have the right, through the natural conformation of the land, to deliver its water through the Woodward avenue sewer to the river.  The court had before it at that time for consideration a situation in which a straggling village, containing but a few hundreds of population, desired to secure entrance into a particular sewer which was at that time, and still is, of a capacity beyond the needs of the city of Detroit.  It determined, in effect, that permission would be granted to make the connection upon certain terms:   (1) That said permission was temporary only, for it distinctly recites that it shall continue only until the further order of the court; (2) "upon the condition that the water flowing in said Wetmore ditch is not turned into said sewer;" (3) upon the condition that the connecting gate shall be under the control of the board of public works of the city of Detroit—

"for the purpose of holding back the water in said Highland Park sewer if it should be necessary to do so in order to keep said Woodward avenue sewer, in the city of Detroit, from overflowing with water to the injury of the adjacent property owners."

Nothing could be clearer to my mind than that this language imported simply a license to the village of Highland Park to use the Woodward avenue sewer only so long as such use could be had by the village of Highland Park without detriment to the inhabitants of the city of Detroit for whom and with the money of whom the sewer had been constructed.  A

situation has now developed which, under the terms of the decree, would have warranted the board of public works in times of excessive precipitation to have closed the gate at the connection, thus holding back the water in the village of Highland Park, so that it might not flood the premises of the citizens of Detroit. This, however, has not been done, and now the village of Highland Park, by reason of this forbearance, charges the city of Detroit with the maintenance of a joint nuisance, a nuisance created solely, as I have attempted to show, by the overloading of the Woodward avenue sewer from waters arising within the village. The decree of 1899 did not, in fact, adjudge that the village of Highland Park throughout any of its area had a right to the use of such sewer for all time, or for any specific time. It dealt solely with the condition as it then was, and not with the conditions as they have arisen since and now are, when a population of upwards of 20,000 occupies a territory which was at that time almost entirely farming land. Streets have been paved and sewers laid in the major portion of the area of the village. The surface water formerly collecting upon said area and passing east to Connor's creek through the Wetmore drain now in a large part finds it way to Woodward avenue in Highland Park and thence into the Woodward avenue sewer in Detroit.

But whatever may be the true construction of the decree of 1899, I am of opinion that it is *res adjudicata* of nothing. It was in no sense a final decree. It distinctly asserts that the decree will remain open, and that either party may apply for a modification as occasion may require. The very fact that the defendant village has applied for a modification of that decree is an admission that it is not a final decree. The rule is laid down in 23 Cyc. p. 1126:

"A judgment cannot be set up in bar of a subse-

quent action unless it was a final judgment on the merits, adjudicating the rights in litigation in a conclusive and definite manner. In order that a judgment should be final within the meaning of the rule just stated, it must be such as puts an end to the particular litigation, or definitely puts the case out of court; otherwise it is merely interlocutory, and constitutes no bar to a subsequent action."

In our own late case of *Le Roy* v. *Collins*, 165 Mich. 380 (130 N. W. 635), it was said:

"A judgment is not *res judicata* unless the identical matter in issue in the subsequent proceeding was determined by the former adjudication."

In the case of *L. E. Waterman Co.* v. *Modern Pen Co.* (D. C.), 193 Fed. 242, it is said:

"A judgment is not available as an estoppel until the court rendering it has finally parted with control over the decision."

See, also, *Reis* v. *Applebaum*, 170 Mich. 506 (136 N. W. 393); *Murphy Chair Co.* v. *Radiator Co.*, 172 Mich. 14 (137 N. W. 791); and *Tuthill* v. *Katz*, 174 Mich. 217 (140 N. W. 519).

The question before the court in 1899 was whether, under the conditions as presented by the proofs in that case, the village should be permitted to temporarily use the Woodward avenue sewer. The village now seeks to make a connection with the Morrell street sewer, a sewer which was not in existence or even thought of at the time the original decree was made. The holding that by the decree made in 1899 the city of Detroit was forever obligated to take care of the sewage of Highland Park, the only matter left open being that of the manner in which it should be taken care of and the terms on which it should be taken care of, is, in my opinion, not only unjust but entirely unwarranted. That it has a right to use the sewers of the city of Detroit (outside the Woodward

avenue sewer in which it has such rights as the decree of 1899 gives it) for its own purposes upon any terms not satisfactory to the city of Detroit, I deny.

The decree of the court below should be reversed, and the petition for modification dismissed.

MCALVAY and KUHN, JJ., concurred with BROOKE, C. J.  OSTRANDER, J., concurred in the result.