## CITY OF DETROIT *v.* CITY OF HIGHLAND PARK.

1. Municipal Corporations—Connecting Sewage System—Treatment of Sewage—Property—Previous Litigation.

Previous litigation between adjoining cities which concededly gave defendant city drainage and flowage rights through the sewers of plaintiff *held,* to have given defendant no right to have its untreated or sanitary sewage treated by the sewage disposal system of plaintiff without payment of a reasonable charge therefor, nor to have given defendant a proprietary interest in plaintiff's sewage system whereby it would be required to pay at per capita cost rate, the matter of treatment of sewage not having been involved in the previous litigation and decree specifically stating the sewer should be the property of plaintiff city.

---

References for Points in Headnotes

[5, 24] 43 Am Jur, Public Utilities and Services, §§ 186, 187.

[10–12, 15, 16] 43 Am Jur, Public Utilities and Services, §§ 112 *et seq.*, 144 *et seq.*

[13] 37 Am Jur, Municipal Corporations, § 263.

[17, 30] 43 Am Jur, Public Utilities and Services, § 104.

[18, 22] 38 Am Jur, Municipal Corporations, §§ 515, 520.

[18, 22] Liability of municipality or other governmental body on implied or quasi contracts for value of property or work. 84 ALR 936; 110 ALR 153.

[19] 12 Am Jur, Contracts, § 4.

[20, 21] 12 Am Jur, Contracts, § 6.

[23] 3 Am Jur, Appeal and Error, §§ 820, 874.

[25] 43 Am Jur, Public Utilities and Services, § 181.

[25] Discrimination between property within and that outside municipality or other governmental district as to public service or utility rates. 4 ALR2d 595.

[26] 43 Am Jur, Public Utilities and Services, § 169.

[29] 43 Am Jur, Public Utilities and Services, § 165.

[31] 43 Am Jur, Public Utilities and Services, § 164.

[32] 14 Am Jur, Costs, § 91.

2. NUISANCE—SEWAGE—PRESCRIPTIVE RIGHTS—MUNICIPAL CORPORATIONS.

There is no prescriptive right on the part of one municipality to deposit sewage or to maintain a public nuisance against another municipality.

3. WATERS AND WATERCOURSES—NATURAL DRAINAGE—RAW SEWAGE.

One city does not have the right to discharge raw sewage upon the property of another, notwithstanding there may be natural drainage through the latter's property.

4. MUNICIPAL CORPORATIONS—SEWAGE SYSTEM—JOINT OWNERSHIP.

Fact that it would be totally impractical for thickly populated defendant city to erect its own sewage treatment plant and and that it is almost completely surrounded by plaintiff city does not give defendant the right to be a joint owner of sewage treatment plant and system built and owned by plaintiff even though the system was designed to provide for treatment of sewage from defendant and other municipalities.

5. SAME—SEWAGE SYSTEM—RATES—COURTS.

Where sewage disposal system was designed and built by plaintiff city to provide for the needs of itself and adjoining municipalities, the court will not set a formula in accordance with which such other municipalities must pay to plaintiff for services, since such a matter is legislative in character and courts will not interfere unless the rate is arbitrary, capricious or unreasonable.

6. SAME—SEWAGE TREATMENT—RIGHT OF FLOWAGE AND TRANSPORTATION OF TREATED SEWAGE.

Where defendant city's right to flowage or transportation of its treated sewage through plaintiff city's sewers has been paid for, plaintiff may not charge for such transportation under the guise of charging for sewage treatment.

7. SAME—SEWAGE DISPOSAL SYSTEM—RATES—COURTS.

While a municipal sewage disposal system must be considered as a whole for purposes of determining the reasonableness of the rate fixed for service rendered by such system, a court still has the power to determine what parts of the system are properly included therein.

8. SAME—SEWAGE DISPOSAL SYSTEM—RATES—INTERCEPTORS—PUMPING STATIONS.

Under evidence showing that a particular interceptor was necessary to keep untreated sewage from passing into a river which was the natural drainage for some 70 per cent. of the

area of defendant city, such interceptor and three pumping stations used in connection with it were properly included as part of the entire sewage disposal system in determining rate which should be charged defendant city for treatment of its sewage.

9. SAME—SEWAGE DISPOSAL SYSTEM—RATES—IMPROPERLY INCLUDED COSTS.

Where portion of the cost of enclosing a creek so that it could transport untreated sewage and the cost of a temporary pumping station was not properly included in the cost of an entire sewage disposal system and may be eliminated from consideration in determining rates, complaint as to such costs which, as allocated, are relatively small, is disregarded as they would not affect trial court's determination as to reasonableness of plaintiff city's charge for use of its sewage disposal system.

10. SAME—SEWAGE DISPOSAL SYSTEM—RATES—DEPRECIATION.

Depreciation charge of approximately 2 per cent. of the total cost of municipal sewage disposal system, inclusive of portion contributed by Federal grant, when such system is considered as a public utility *held*, not excessive as an annual charge for purpose of determining rate for use of such system, since it is the city's obligation to operate and maintain the entire plant.

11. SAME—SEWAGE DISPOSAL SYSTEM—DEPRECIATION—EXPLOSIONS—OBSOLESCENCE.

Since the purpose of depreciation is to permit recovery over the useful life of the property of the capital invested in it and the length of the useful life is frequently difficult to determine in advance, a charge of 1 per cent. for interceptors and regulators and larger percentages for buildings, equipment and machinery used in a municipal sewage disposal system is not unreasonable, especially in view of the ever present danger of explosions in the sewers as well as erosive wear from the contents, the factor of obsolescence and possible collapse of various interceptors.

12. SAME—SEWAGE DISPOSAL SYSTEM—PUBLIC UTILITY—RETURN ON INVESTMENT.

Where there is no question as to repayment of the cost of a sewage disposal system erected by city to serve its own needs and the needs of other nearby municipalities, as an item of operating expense, in suit by such city against municipal user of service afforded, the sums advanced by such

city are to be considered as an investment in a utility on which the city may earn a reasonable return.

13. OFFICERS—DISCRETION—COURTS.

Courts will not interfere with the discretion of public officers of a municipality, engaged in a public activity, as to business practices unless there is fraud or bad faith shown.

14. MUNICIPAL CORPORATIONS—REVENUE BOND ACT—SEWAGE DISPOSAL SYSTEM—RATES.

The revenue bond act is cumulative and authorizes a city to construct a sewage disposal system, the issuance of revenue bonds, and enactment of an ordinance for the charging of rates for the use thereof to pay for the plant (PA 1933, No 94, as amended).

15. SAME—SEWAGE DISPOSAL SYSTEM—REVENUE BOND ACT—DEPRECIATION—RATES—PUBLIC UTILITY.

While the revenue bond act which, at time of issuance of bonds for portion of cost of sewage disposal system, provided for setting up of a depreciation reserve, no longer contains such provision, the city which is not recovering its capital as part of the expense, may establish depreciation charges sufficient to rebuild and restore the system over its service as proper items of expense in determining the rate to be charged on a utility basis (PA 1933, No 94, as amended).

16. SAME—SEWAGE DISPOSAL SYSTEM—FEDERAL GRANT—DEPRECIATION—INVESTMENT—RATES.

Nonrecurring Federal grant to plaintiff city for portion of cost of sewage disposal system was properly included as part of cost of system used as basis for computing depreciation but was not proper as part of the investment by plaintiff in determining the reasonableness of the rate charged for use of the system by others than the plaintiff.

17. SAME—SEWAGE DISPOSAL SYSTEM—RATES—PUBLIC UTILITY.

It is proper for a municipality which owns a sewage disposal system to charge rates for the use thereof on the basis of operating a public utility.

18. SAME—IMPLIED CONTRACT—ACCEPTANCE OF SERVICE—RATES.

Generally services furnished by one municipality to another municipality are on a contractual basis and the acceptance of services implies a promise to pay therefor at the established rate.

19. CONTRACTS—IMPLIED IN FACT—MEETING OF MINDS.
   A contract implied in fact does not exist unless the minds of the
   parties meet, by reason of words or conduct.

20. SAME—QUASI OR CONSTRUCTIVE CONTRACTS.
   A contract implied in law is quasi or constructive, and does
   not require a meeting of minds, but is imposed by fiction of
   law, to enable justice to be accomplished, even in case no
   contract was intended.

21. SAME—FICTION OF QUASI OR CONSTRUCTIVE CONTRACT EMPLOYED
   WITH CAUTION.
   Courts employ the fiction of quasi or constructive contract with
   caution, and will never permit it in cases where contracts,
   implied in fact, must be established, or substitute one prom-
   isor or debtor for another.

22. MUNICIPAL CORPORATIONS—SEWAGE DISPOSAL SYSTEM—RATES—
   CONTRACT IMPLIED IN LAW.
   The raising of an implied contract in law for payment of serv-
   ice rendered by plaintiff city to defendant city for treat-
   ment of latter's raw sewage at the established rate would
   not permit the plaintiff to set an exorbitant or confiscatory
   charge but would limit it to a reasonable rate; especially
   where the integration of the sewer systems of the two cities
   is so complete as to render it impracticable if not impossible
   for defendant to refuse to accept plaintiff's services in such
   respect.

23. APPEAL AND ERROR—QUESTIONS REVIEWABLE—IMPLIED CONTRACT.
   Whether or not there is an implied contract to pay for treat-
   ment of defendant city's untreated sewage in plaintiff's sew-
   age disposal system is not determined where defendant ad-
   mits it should pay for such services at a reasonable rate.

24. MUNICIPAL CORPORATIONS—SEWAGE DISPOSAL SYSTEM—RATES—
   REASONABLENESS—PRESUMPTIONS—BURDEN OF PROOF.
   A rate for treatment of defendant city's untreated sewage,
   lawfully established by plaintiff city for use of its sewage
   disposal system, is assumed to be reasonable in the absence
   of a showing to the contrary or a showing of fraud or bad
   faith or that it is capricious, arbitrary or unreasonable and
   the burden is on the defendant who claims it is unreasonable
   to show that such is the case.

25. SAME—SEWAGE DISPOSAL SYSTEM—RATES—DIFFERENTIAL BE-
   TWEEN OWNING AND SERVICED MUNICIPALITIES—GROSS REVENUE.
   The mere fact that there is a differential between the rate
   charged to residents of plaintiff city which erected a sew-

age disposal system and the rate charged to adjacent municipalities for treatment of their raw sewage does not make the latter rate unreasonable, for while plaintiff may not charge the adjacent municipalities a rate sufficient to pay part of the cost of furnishing service to its own residents, it may pay part of the costs of the system out of general taxes so as to lower the actual rate to its own residents and take into consideration that the property of the utility is not taxed and other services furnished by the city without charge, such as fire and police protection in determining the gross revenue of the system.

26. SAME—SEWAGE DISPOSAL SYSTEM—COMPUTATION AS TO INCOME AND EXPENSES—RETURN ON INVESTMENT.

Computation of trial court as to income and expense of sewage disposal system erected by plaintiff city for its own needs and for servicing adjacent municipalities, whereby it was determined that profit made an overall return of 5.97 per cent. on city's investment, is adopted as not an unreasonable rate of return.

27. SAME—SEWAGE DISPOSAL SYSTEM—RATES—DECREES.

Where defendant city was nearly surrounded by plaintiff city and the sewer systems of the two municipalities are so integrated as to render it impracticable, if not impossible, for defendant not to accept the services of plaintiff in treatment of raw sewage, defendant was not entitled to provision in decree that it was not compelled to pay the rate established by plaintiff for municipalities other than itself or forego the service, though defendant must pay a reasonable rate for such service.

28. APPEAL AND ERROR—ADMISSION OF EVIDENCE—ERRONEOUS THEORY.

It is unnecessary to determine whether or not the admission of certain exhibits and testimony pertaining thereto was proper where they were presented for purpose of demonstrating the fallacies in defendant city's method of computing what it should pay for treatment of its raw sewage in plaintiff's sewage disposal system and both the trial court and the Supreme Court held the defendant's theory was wrong.

29. MUNICIPAL CORPORATIONS—SEWAGE DISPOSAL SYSTEM—RATES—EVIDENCE.

In suit to determine reasonableness of rate, established by plaintiff city for use by adjacent municipalities of its sew-

age disposal system, in regard to return on its investment, it was proper to show what had been determined as proper rates of return for similar utilities.

30. SAME—SEWAGE DISPOSAL SYSTEM—RATES FOR OTHER MUNICIPALITIES AND OTHER USERS.

A city may charge for the use of its sewage disposal system by suburban municipalities as well as all other users and may establish a reasonable rate for such service.

31. APPEAL AND ERROR—MUNICIPAL CORPORATIONS—SEWAGE DISPOSAL SYSTEM — RATES — AFFIRMANCE WITHOUT PREJUDICE — CHANGE OF CIRCUMSTANCES.

Affirmance of decree holding rate established by city for use of its sewage disposal system by other cities and other users to be reasonable is affirmed without prejudice to either party, upon very material changes in circumstances, to seek a readjustment of the rate and modification of such decree.

32. COSTS—PUBLIC QUESTION—MUNICIPAL SEWAGE DISPOSAL SYSTEM —RATES.

No costs are allowed in suit by one city against another to determine reasonableness of rates charged by plaintiff for use of its sewage disposal system, a public question being involved.

Appeal from Wayne; Brennan (Vincent M.), J. Submitted June 17, 1949. (Docket No. 33, Calendar No. 44,367.) Decided October 12, 1949.

Bill by City of Detroit and another against City of Highland Park to restrain the defendant from discharging untreated sewage into sewerage system of plaintiff. Cross bill by defendant against plaintiff for determination of amount to be paid by defendant for sewage disposal. Decree for plaintiffs. Defendant appeals. Affirmed.

*Raymond J. Kelly,* Corporation Counsel, *Paul T. Dwyer,* Chief Corporation Counsel, and *Julian P. Rodgers,* Assistant Corporation Counsel, for plaintiffs.

*Earl B. Young,* City Attorney (*Claud H. Stevens,* of counsel), for defendant.

BUTZEL, J. The city of Detroit, as plaintiff, filed a bill against the city of Highland Park, defendant. Harry C. Genshaw of Detroit, a ratepayer for sewage disposal service and a taxpayer, joined in the bill. We shall refer to the city of Detroit, however, as plaintiff. We use "/mcfw" to designate "per 1,000 cubic feet of water," and we refer to the raw sewage before it is treated by the sewage disposal plant as "sanitary sewage," as it is frequently called.

Plaintiff makes the following allegations. It has constructed, owns, maintains and operates a sewage disposal system, including a sewage treatment plant, interceptors, pumping stations, et cetera, in Detroit and its vicinity. The system has been in operation since prior to May 3, 1940, and the entire cost, including interceptors, et cetera, was $26,842,349.45. In order to partly provide for the cost of the system, including necessary interceptors, plants, pumping stations, et cetera, it issued revenue bonds in the amount of $5,075,000 and in addition to the proceeds therefrom it expended $21,767,349.45 for the sewage disposal system; that it has been required to expend for the maintenance and operation of the system up to June 31, 1941, an amount in excess of $1,380,053.82, and it did expend for the year ending June 30, 1940, the sum of $338,290.84, and from year to year it will be necessary to expend similar large sums of money and also provide for depreciation reserves, bond and interest redemption fund reserves, and contingent fund reserves as required by law; that in ac-

cordance with PA 1933, No 94, as amended (CL 1948, § 141.101 *et seq.* [Stat Ann 1949 Rev § 5.2731 *et seq.*]), chapter 124, Compiled Ordinances of the city of Detroit of 1936, as amended, plaintiff is required to establish rates for services furnished by the system and accordingly it did establish a rate of $0.2161/mcfw to all suburban municipalities, including Highland Park, on the basis of water-to-main, while the charge to individual suburban users was $0.25/mcfw as shown by the water meters. (It is conceded that the charge for sewage disposal is properly based on water used.) The city of Highland Park, adjacent to the city of Detroit, had been discharging its sanitary sewage into plaintiff's mains and this has created a nuisance. While the city of Highland Park may, if it chooses, finance, construct and operate its own sewage treatment plant, it refuses to do so or to pay the amount charged by plaintiff. At the time of the filing of the bill defendant owed the city of Detroit $149,357.85. Plaintiff asks that Highland Park be enjoined from further discharging its untreated sewage, waste or other objectionable or deleterious matter into the public sewage disposal system of the city of Detroit pending an accounting and payment to the plaintiff of the reasonable charges theretofore established by plaintiff for the use of such system by Highland Park. Highland Park in its answer does not deny the right of the city of Detroit to charge a reasonable amount for sewage disposal treatment but does contend that $0.2161/mcfw is excessive. It claims that under various decrees in the past, and particularly the one entered in accordance with the opinion in *City of Detroit* v. *Village of Highland Park,* 186 Mich 166 (Ann Cas 1917E 297), it has a right to use the Detroit sewers for surface waters and properly treated sewage. It shows that $9,000,000 of the cost to plaintiff was contributed by the Federal government as a PWA

project, towards the construction of the sewage disposal plant, on the representation of the city of Detroit that the sewage disposal system was being built to serve not only the city of Detroit but also the surrounding communities; and that the actual cost to the city, after eliminating charges which it claims should be excluded, and after deducting the $9,000,000 received from the Federal government, was $16,626,721.44. Defendant filed a cross bill asking the court to determine the proper method or formula by which the amount to be paid by the city of Highland Park to the city of Detroit from year to year for sewage treatment and disposal may be established. The rate charged to its own residents by the city of Detroit, which paid from its tax moneys for a very large portion of the cost of the sewage disposal system, is $0.11/mcfw.

When Detroit was comparatively small and Highland Park a sparsely populated village there was no difficulty. Woodward avenue runs north and south through the center of Detroit and is also the main street of Highland Park, which it bisects, and all the sewage from Highland Park ran through the Woodward avenue sewer to the river at the foot of Woodward avenue. As both municipalities grew in size difficulties were encountered. Highland Park is situated directly north of Detroit and is entirely landlocked. On the east it abuts Hamtramck, formerly a village and now a city, and on the other three sides it is bounded by the city of Detroit. Litigation arose in 1898, when the city of Detroit sought to enjoin Highland Park from connecting its sewer with the Woodward avenue sewer in Detroit. The following year the circuit court for Wayne county entered a decree authorizing such construction but provided for the payment of the sum of $500 per year to Detroit. Shortly thereafter, however, Detroit constructed a sewer system for the Palmer

Park area of Detroit, immediately north of Highland Park, and petitioned the court for leave to connect its new sewer with the Highland Park sewer. By supplemental decree this was granted but the annual payment of $500 was ordered discontinued. No appeal was taken in this case. In 1913, due to the growth of the populations of both Detroit and Highland Park and the overloading of the capacity of the sewer system, the State board of health declared the existence of a nuisance because the large flow of sewage caused the sewers to overflow. In 1913, Highland Park by decree supplemental to the former one was granted permission to connect certain of its sewers with the new Morrell street sewer of Detroit. In 1915, by an evenly-divided opinion of this Court, the decree was affirmed on appeal in slightly modified form (*City of Detroit* v. *Village of Highland Park, supra*). The final decree provided that the village of Highland Park had the right to discharge its sewage through the sewers of the city of Detroit to the Detroit river; further, that $600,-000 was a proper compensation to Detroit for the use of such portion of its sewers as was required for disposal of the sewage of the village of Highland Park; and further

"D. IT IS FURTHER ORDERED, ADJUDGED AND DE-CREED that * * * the payment of said total sum of $600,000 shall require the city of Detroit to furnish to the village of Highland Park full, complete and adequate outlet for its sewage; and should the outlet furnished through a connection with the Morrell street sewer hereafter prove inadequate, the city of Detroit shall be bound to furnish other connections to the village of Highland Park at its limits, said connections being constructed of such sizes and upon such grades as shall enable the village to properly drain all the territory within its present limits. * * *

"G. IT IS FURTHER ORDERED, ADJUDGED AND DE-

CREED that either party may apply to the Court for a modification of this decree at any time in the future as occasion may require."

This sum of $600,000 in the decree was arrived at by charging $380,183.35 based on one-half cent per square foot of drainage area of Highland Park, and the further sum of $219,816.65 as compensation for changes in the sewer system then or thereafter made to furnish and provide for present and future outlet needs of the village of Highland Park.

With the tremendous growth of both cities and the enormous quantity of sanitary sewage discharged at the outlets of the sewers a condition arose that was dangerous to the health and comfort of the city of Detroit and resulted in the pollution of the Detroit river. By P.A. 1929, No 245 (CL 1948, § 323.1 *et seq.* [Stat Ann § 3.521 *et seq.*]) and a treaty between the United States and Great Britain* it became unlawful to pollute the Detroit river. It thus became necessary to treat sanitary sewage before it was discharged into the Detroit river. Detroit adopted an ordinance authorizing the construction and operation of a sewage disposal system and the issuance of revenue bonds to pay in part for the cost of such construction, in accordance with the provisions of P.A 1933, No 94, as amended (see CL 1948, § 141.101 *et seq.,* entitled "The revenue bond act of 1933" [Stat Ann 1949 Rev § 5.2731 *et seq.*]). This ordinance became effective October 28, 1935. Other facts will be detailed in the course of this opinion.

The entire issue in the instant case largely resolves itself into the question of whether the rate established by plaintiff to defendant is a reasonable one. The trial judge after a protracted hearing held that the rate of $0.2161/mcfw established by plaintiff was proper and refused to set a new or dif-

---

* Ratified by the United States Senate on March 3, 1909, and by Great Britain on March 31, 1910.

ferent formula for establishing the rate, and dismissed the cross bill asking that this be done. Defendant appeals and raises many questions which we shall discuss seriatim.

Defendant first contends that it is entitled to use of the facilities of the Detroit sewage disposal system upon payment of a share of the capital costs, and also a share of the operating costs in proportion to its use of the system. This claim was raised by its cross bill, which the lower court correctly dismissed. Defendant admits that it is not entitled to the use of the sewage disposal system without paying for it, but denies that the plaintiff has the right to establish a rate applicable to defendant on a utility basis. Defendant claims some kind of proprietary interest or rights in the sewer system of Detroit because of the former adjudications. Plaintiff concedes that the prior litigation gives defendant drainage and flowage rights through the sewers of Detroit, and does not refuse to furnish means for the flowage of treated sewage and storm water to the Detroit river. Plaintiff, however, rightfully claims that the prior adjudication gave defendant no right to have its sanitary sewage treated by the sewage disposal system of Detroit without paying the rate as established by Detroit, if it is not unreasonable. Though the opinion in the case of *City of Detroit* v. *Village of Highland Park, supra,* was by an evenly-divided court, the decree entered affirming the lower court and the payments made in accordance therewith and the subsequent acquiescence therein by the parties, defines the rights of the defendant to flowage of its effluent and storm waters through the sewers of plaintiff to the Detroit river. However, that decree did not give the village of Highland Park any proprietary interest in the sewers of Detroit. The payments ordered by the former decree were based on the amount of drainage area of Highland

Park, plus a part of the cost of extending the Mor-rell street sewer to the city limits of Highland Park. The decree expressly provided that such extension of the Morrell street sewer "when built and completed shall be the property of the city of Detroit." The decree in no way held or implied that Highland Park was to be considered joint owner or partner in the sewer system of the city of Detroit. No question of treatment of sewage was involved in that case. The former adjudication did not hold, nor is it claimed by defendant, that it give the village of Highland Park, or its successor the city of Highland Park, the right to discharge sanitary sewage into the Detroit sewers without fully compensating Detroit for the treatment of the sanitary sewage through Detroit's sewer disposal system. At the time of the decision the treatment of sanitary sewage was not considered. PA 1929, No 245, *supra,* had not been enacted.

In *Gundy* v. *Village of Merrill,* 250 Mich 416, we held that there was no prescriptive right to deposit sewage or to maintain a public nuisance against another municipality. In *Dohany* v. *City of Birmingham,* 301 Mich 30 (11 NCCA NS 638), we again held that the city of Birmingham did not have the right to discharge raw sewage upon the property of another, notwithstanding the allegation that it had a natural drainage through such property. Also, see *Attorney General, ex rel. Township of Wyoming,* v. *City of Grand Rapids,* 175 Mich 503 (50 LRA NS 473, Ann Cas 1915A 968). We find no merit in the claim that the former adjudication gives defendant the right to have its sewage treated upon its paying a share of the capital costs of that part of the system it uses and a share of the operating expenses based on the amount of sewage it contributes to the entire amount treated. It is not a joint owner of the Detroit sewer system but merely is entitled to have its

sewage, when properly treated, and its storm waters transported to the Detroit river without charge.

Defendant has no more right to empty its untreated sewage into the Detroit river than the plaintiff has and so must provide for treatment thereof. Defendant maintains in its briefs, though it is not shown by the record, that it would be totally impractical for it to build a treatment plant of its own. Highland Park is completely landlocked by the city of Detroit except for a small part that borders on the city of Hamtramck. It has a comparatively small area that is thickly populated and regardless of the cost of building such plant, it is claimed that the plant would become a nuisance to the surrounding neighborhood and if built near the border line between Highland Park and Detroit, it would become a nuisance to the city of Detroit. This, however, does not give it the right to be a joint owner of a treatment plant and system built and owned by the city of Detroit, even though such system was also designed to provide for treatment of sewage from Highland Park and other municipalities. It is claimed that Highland Park stands in a better relationship to the use of such facilities than other municipalities in the metropolitan area in and about Detroit, but none of them have the right to the use of the sewage disposal system of Detroit without paying for it. For these reasons the cross bill was properly dismissed. The court will not set a formula in accordance with which Highland Park is to pay for the services of Detroit's sewage disposal system. This is a legislative matter and unless the rate is arbitrary, capricious or unreasonable, the courts will not interfere.

Defendant next contends that the capital and operating costs of certain interceptors, structures and machinery included by Detroit as part of its sewage disposal system, should be eliminated, at least inso-

far as they are included in computing the reasonableness of the rate or charge to Highland Park. Defendant claims that these structures are a part of the transportation system and not a part of the sewage disposal system. The structures specifically objected to are the River Rouge interceptor, the Puritan-Telegraph, Warren-Pierson (Rouge Park), Ford Road and Lonyo pumping stations, and the Baby creek sewer. As stated above the former adjudication gave the defendant the right to flowage or transportation of its treated sewage through the plaintiff's sewers. This right has been paid for and plaintiff may not charge defendant for such transportation under the guise of charging for sewage treatment. Plaintiff makes a distinction between its sewage transportation system for collecting sewage and the sewage disposal system which includes interceptor sewers by which the sewage is taken from trunk sewers to the disposal plants and there treated before being discharged into the river. Plaintiff only claims the right to set a rate for the use of the sewage disposal system, and maintains that all the overground and underground structures objected to by the defendant are properly a part of one disposal system which must be regarded as a unit. Plaintiff also claims that what is to be included in each system is a legislative function, and the entire system as determined by the city of Detroit must be considered for the purpose of fixing a rate. It is true that the system must be considered as a whole for purposes of determining the reasonableness of the rate fixed, but the court still has the power to first determine if what Detroit claims are parts of the system have been properly included therein. Were Detroit to undertake to treat sewage from municipalities far from the metropolitan district of Detroit, defendant might properly raise objection if it were charged more on that account.

The largest item objected to is the River Rouge interceptor. This was constructed prior to the construction of the Detroit treatment plant or the Federal grant for such construction. It was necessary to keep sanitary sewage out of the River Rouge which is a comparatively small and sluggish stream flowing into the Detroit river. The River Rouge interceptor performs the same function in connection with the River Rouge as the Detroit river interceptor performs in connection with the Detroit river, the latter being conceded to be part of the sewage disposal system. Witnesses testified that the River Rouge interceptor was properly a part of the sewage disposal system and necessary to keep the sewage out of the River Rouge, the natural drainage course, and that "the River Rouge is the natural storm water drainage for * * * 70 per cent. of the area of Highland Park." It is quite logical to assume that sanitary sewage also was mixed with the flow of storm waters, though there is no direct testimony on this point. There was testimony that the River Rouge could not be enclosed as it drained a large area of storm water. Only that part of the interceptor allocable to sanitary sewage had been included in the cost of the disposal system. This appears to properly be a part of the disposal system, and the objections of defendant are without merit. This also is true of the 3 pumping stations used in connection with this interceptor and a part thereof as far as operation is concerned.

From the testimony and exhibits there may possibly be some merit to the claim of defendant as to the Baby creek sewer and the Lonyo pumping station. The Baby creek sewer is to enclose the former open Baby creek so as to carry both sanitary sewage as well as the natural storm-water drainage. It is properly a part of the transportation system as it performs no functions peculiar to the disposal sys-

tem, nor is it a necessary part thereof.   The same is true of the Lonyo pumping station which was used in connection with the transportation system to keep sewage out of Baby creek until that sewer was completed.   However, though these items may be eliminated from the costs in computing the reasonableness of the rate only that part of the cost of the Baby creek sewer allocable to sanitary sewage was charged to the disposal system, and the Lonyo pumping station has been discontinued so that these 2 items do not affect the result of the computations of the trial judge to a sufficient extent so as to affect the question of reasonableness.   There are other small items to which defendant objects but they do not merit discussion as they, also, are not sufficient to affect the overall result or else they have been eliminated since the suit was started, due to change in conditions.

Defendant contends that a depreciation charge amortizing the cost of the system over its service life should not be included as an operating expense.   Defendant admits that some depreciation charge is proper but objects to that being made by the plaintiff.   Defendant claims large sums over a term of years for depreciation and underground structures such as interceptors and regulators should be eliminated and that depreciation should be charged on the buildings and equipment only for a short period sufficient to build up a fund to meet emergencies.   It contends that to charge depreciation sufficient to amortize the cost over the service life of the system is to charge this generation for improvements to be used by the next generation.   Plaintiff, on the other hand, claims that the amount of depreciation to be charged as an expense is largely a matter of discretion and the charges made are proper and reasonable.   The annual depreciation charged by plaintiff is 1 per cent. on the interceptors and regulators, $2\frac{1}{2}$

per cent. on buildings and other structures, and 5 per cent. on equipment and machinery, nothing on the land. The total depreciation charge is a little more than $488,000 per year or less than a flat rate of approximately 2 per cent. of the total cost of the disposal system. Plaintiff maintains that all regulatory bodies allow depreciation to municipal utilities and at a much higher rate than it is charging. Considering the disposal system as a public utility operated by plaintiff, the depreciation charge should be allowed on all parts of the system and is not excessive.

The purpose of depreciation is to permit recovery over the useful life of the property of the capital invested in it. The length of the useful life of the property frequently is difficult to ascertain with any exactitude. One per cent. a year for the interceptors and regulators and larger percentages for buildings, equipment and machinery is not unreasonable. From the depreciation fund larger repairs and replacements can be made from time to time. The testimony shows that there is ever present danger of explosion in sewers as well as erosive wear from the contents of the sewage at times and also that sewers and especially disposal and treatment plants are subject to obsolescence as it is a new field of engineering and is being constantly improved. Not only is there constant danger of explosions due to the gaseous nature of the sewage or gasoline spilling into the sewer, but also there may be failure or a collapse of the interceptors due to faulty workmanship, material or design. See *City of Detroit* v. *Porath,* 271 Mich 42, which involved a cave-in of a large portion of an underground sewer. There is no testimony as to the much higher cost of labor maintenance since the system was built.

Defendant recognizes these dangers but contends that they can be provided for by charging deprecia-

tion for a limited number of years to build up a fund for such emergencies. It relies on some statements in the case of *Wolgamood* v. *Village of Constantine,* 302 Mich 384. However, the facts in that case were entirely different than in the instant case. The question raised there was whether the depreciation fund was sufficient to comply with the requirements of the trust mortgage, and the Court held it was, that a city was not required to set up a depreciation fund sufficient to replace the plant at the end of its service life, and that such a fund would be unreasonable in addition to the repayment of the cost of the plant. There is no question of repayment of the cost of the plant to the city of Detroit, as an item of operating expense in the instant case, as the huge sums advanced by Detroit are to be considered as an investment in a utility on which Detroit may earn a reasonable return. The Court in the *Wolgamood Case, supra,* held that courts will not interfere with the discretion of public officers of a municipality engaged in a public activity as to business practices unless there is fraud or bad faith shown. Plaintiff also stresses the provisions of PA 1933, No 94, as amended, *supra,* which expressly provided for a depreciation reserve being set up. It issued revenue bonds under the provisions of the act. However, the bonds so issued were only for a small part of the total cost. While it may be claimed that the act is only to protect bondholders and when the bonds are retired there is no longer any requirement as to a depreciation fund, the act is cumulative and provides for the construction of a sewage disposal plant and for the charging of rates for the use thereof to pay for the plant. It is true that the act does not specify what the rate of depreciation should be and as amended since the reissuance of these bonds, no longer provides for a depreciation fund to be set up, and so is not controlling of the claim of plain-

tiff. But on a utility basis. where the city is not re-covering its capital as part of the expense, deprecia-tion charges sufficient to rebuild and restore the sys-tem over its service are proper items of expense. in determining the rate to be charged. In view of the facts in this case, we do not believe that too large a sum has been charged for depreciation. Depreci-ation has been charged on the total cost of the sys-tem including the $9,000,000 Federal grant. It is true that this Federal grant was made on the basis of a plan to also provide sewage disposal facili-ties for Highland Park and other municipalities surrounding Detroit, as well as for Detroit itself, and so for their benefit too. This is not a recur-ring grant. It was given to the city of Detroit. The revenue bonds were issued by the city of Detroit. The system is the property of the city of Detroit and operated and maintained by it. The Federal grant was not included as part of the investment by Detroit in determining the reasonableness of the rate charged. However, it was proper to include it for the purpose of charging the depreciation on the entire system as it depreciates. It is in-cumbent on the city of Detroit, the owner, to keep up, repair or rebuild the system to the extent that it becomes necessary through depreciation in order to protect its large investment, the advance of almost $12,000,000 in cash besides the issuance of the bonds. Defendant's chief expert witness stated that if de-preciation were to be charged it would be proper to include the Federal grant as it should be a charge on the system.

The defendant mainly relies on its claim as ad-vanced in its cross bill that it should only pay a pro-portional share of the capital costs and operating expenses and should not be charged for sewage treat-ment on the basis of a utility rate. But it further contends that even if it is to be charged a utility

rate, the rate of 21.61 cents per mcfw to the mains is unreasonable and the court below erred in holding that it was reasonable. Defendant's claim that the rate so established by plaintiff is unreasonable depends in part on the correctness of its prior claims as to what is to be included in the system and the question of the depreciation to be charged. These questions having been found against the defendant, its claim that the rate is unreasonable loses its force.

Clearly the city of Detroit has the right to set reasonable rates to be charged for the treatment of sewage by its disposal system. We have already held that it is proper for plaintiff to charge rates on the basis of operating a public utility. The revenue bond act (PA 1933, No 94, as amended, *supra*) is cumulative and authorizes the construction of the disposal system as well as the issuance of the bonds. This act expressly provides that rates for service shall be set by ordinance. The rates here were properly established by ordinance No 340-c, as amended, providing for the setting of suburban rates by the board of water commissioners, subject to approval of the common council. The suburban rates were so set by the board and approved by the common council of Detroit on June 4, 1940.

Plaintiff makes the claim that defendant is liable on the basis of implied contract to pay the established rate by the acceptance of services rendered thereafter. It is true that the general rule is that services furnished by one municipality to another municipality are on a contractual basis and the acceptance of services implies a promise to pay therefor at the established rate. *City of Lexington* v. *Jones,* 289 Ky 719 (160 SW2d 19); *Mitchell* v. *City of Mobile,* 244 Ala 442 (13 So2d 664); *Henrico County Board of Supervisors* v. *City of Richmond,* 162 Va 14 (173 SE 356); and cases therein cited. There was no express contract to pay the rate es-

tablished by plaintiff. Defendant has been opposing such rate. The rule of implied contracts as stated by this Court in *Cascaden* v. *Magryta*, 247 Mich 267, is.: ·

"There are two kinds of implied contracts: One implied in fact, and the other implied in law. The first does not exist unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law, to enable justice to be accomplished, even in case no contract was intended.

"In order to afford the remedy demanded by exact justice and adjust such remedy to a cause of action, the law sometimes indulges in the fiction of a quasi or constructive contract, with an implied obligation to pay for benefits received. The courts, however, employ the fiction with caution, and will never permit it in cases where contracts, implied in fact, must be established, or substitute one promisor or debtor for another."

Also, see 17 CJS, p 322, Contracts, § 6, which discusses constructive or quasi contracts. This does not mean that the court will imply a contract that would enable plaintiff to set an exorbitant or confiscatory charge, but plaintiff is limited to a reasonable rate. This is especially true in the instant case where it would be impracticable if not impossible for defendant to refuse to accept the services of the plaintiff as to sewage treatment because of the integration of the sewer systems of the two cities. However, it becomes unimportant whether it is held there is an implied contract or not as defendant admits it should pay for such services at a reasonable rate.

The rate lawfully established by the plaintiff is assumed to be reasonable in absence of a showing to the contrary or a showing of fraud or bad faith

or that it is capricious, arbitrary or unreasonable, and the burden of proof is on the defendant to show that the rate is unreasonable. The mere fact that there is a differential between the rate charged to the residents of Detroit and the rate charged to the adjacent municipalities does not make the latter rate unreasonable. Plaintiff may not charge the adjacent municipalities a rate sufficient to pay part of the cost of furnishing service to its own residents, but may pay part of the costs of the system out of general taxes so as to lower the actual rate to its own residents, and may further take into consideration the fact that the property of the utility is not taxed and the other services furnished by the city without charge, such as fire and police protection, et cetera. The court below took this into consideration in its computations by applying the suburban rate to the total water to the mains of Detroit and to all the users of the disposal system to determine the gross revenue of the system. The court below, on the basis of the exhibits introduced in evidence, made an independent computation of the revenues and operating expenses of the system to determine the profit to plaintiff and the return on the investment at the rate set. The trial judge made certain changes in the items set forth by defendant in its computations and eliminated others. He held that plaintiff was entitled to a fair return on its investment but not on the $9,000,000 government grant. We adopt herein the computation of the trial court:

"INCOME AND EXPENSE COMPUTATION DETROIT SEWAGE
DISPOSAL SYSTEM

Average
for six fiscal
years ending
June 30, 1946

"I. Total revenues if all political units are charged
$.2161 per 1000 cu. ft. of the water consump-
tion shown on exhibit 48 ..................  $2,855,190.35

"II. Expenses—
    1. Operation and maintenance of
        plant after deducting inter-
        ceptors and regulators (main-
        tenance) and depreciation ..  $985,076.15
    2. Maintenance of interceptors
        and conduits—actual expen-
        ditures ..................      2,507.05
    3. Operation and maintenance of
            pumping stations
        Fairview
        Connor Creek
        Oakwood
        Lonyo
        Ford Road
        Rouge Park
        Puritan-Telegraph  ........    243,289.62
    4. Administrative and general ex-
        pense (5% of annual reve-
        nues) ....................     142,759.52
    5. Depreciation on interceptors,
        regulators, structures and
        equipment (exhibit 40-A) ..    488,235.00
    6. Interest on bonds ..........       0.00
    7. Principal on bonds .........       0.00
    8. Yearly amortization charge to
        repay the sum of $11,476,-
        243.63 advanced by the city
        of Detroit as part of con-
        struction costs of sewage dis-
        posal system .............        0.00
        Total expenses ......................... $1,861,867.34

"III. Average annual excess of revenues over ex-
        penses before provision for a return on cap-
        ital investment ......................... $993,323.01"

These figures were an average of the 6 years shown by the exhibits. The changes that might be implied from parts of this opinion would not make an appreciable difference in the totals and are disregarded here. The average annual profit is shown to be $993,-323.01. The court below applied this to an average depreciated plant investment of $16,634,213.96, showing an over-all return of 5.97 per cent. which it held was not unreasonable. In view of the rates of return that have been allowed other utilities both by the regulatory bodies and courts of this State and other States, we cannot say this is such a large rate of return so as to make the rate to defendant unreasonable.

The final 2 questions raised by the defendant do not merit much further discussion. They have been fully considered. Defendant contends the court erred in refusing to include in the decree certain language requested by defendant stating that Highland Park is not compelled to pay the rate established by Detroit or forego the service, though it must pay a reasonable rate for such service. The requested language was neither fully in accord with the lower court's opinion nor the opinion of this Court and was properly excluded. Further it is not shown that the refusal to include this language prejudiced the rights of defendant in any way.

Defendant objected to the introduction of certain exhibits and the testimony pertaining thereto at the trial, and claims the court erred in overruling such objections and allowing the exhibits to be introduced. Many of the exhibits objected to were introduced to demonstrate the fallacies in defendant's method of computing what it should pay. As the court below and this Court held that this theory was wrong, there was no prejudice in the admission of these exhibits and it need not be decided if their admission was proper or not. The only exhibit that de-

fendant specifically refers to in its brief as being improperly admitted in evidence is the one showing the rates of return allowed other utilities. As the question involved was the reasonableness of the rate established in regard to the return it allowed on the investment, it was proper to show what had been determined as proper rates of return for similar utilities. The exhibit was properly admitted.

The city of Detroit is entitled to charge for use of its sewage disposal system by suburban municipalities as well as all other users, and may establish a reasonable rate for such service. Users, including suburban municipalities such as defendant herein, must pay the established rate, subject only to the condition that such rate must be reasonable. The lower court properly dismissed defendant's cross bill and found the rate of $.2161/mcfw was reasonable and that defendant must account therefor. The parties entered into a stipulation in order to avoid an accounting and without prejudice to defendant's rights on appeal that if plaintiff prevailed on appeal, $387,847.87 would be due plaintiff up to March 31, 1947. The trial court incorporated the stipulation in its decree.

The decree of the lower court is affirmed, but without prejudice to either party, upon very material changes in circumstances, to seek a readjustment of the rate and a modification of this decree. As a public question is involved, no costs will be allowed.

Sharpe, C. J., and Bushnell, Boyles, Reid, North, Dethmers, and Carr, JJ., concurred.