[No. 33279. Department Two. February 16, 1956.]

SWAN J. FAXE, *Respondent*, v. THE CITY OF GRANDVIEW, *Appellant.*

CHRIS JENSON, *Respondent*, v. THE CITY OF GRANDVIEW, *Appellant.*[1]

[1]Reported in 294 P. (2d) 402.

*Gordon Blechschmidt, Velikanje, Velikanje & Moore,* and *Paul M. Goode,* for appellant.

*Kenneth C. Hawkins* and *Chaffee & Aiken,* for respondents.

A. C. Van Soelen, Arthur Schramm, James Arneil, Kenneth A. Cole, Leslie R. Cooper, B. A. Farley, Paul F. Schiffner, James B. Hovis, Elwood Hutcheson, Ralph G. Swanson, John McSherry, Jr., and Lawrence S. Cleman, amici curiae.

HAMLEY, C. J.—This action brings into question an ordinance of the city of Grandview increasing rates for water service rendered outside the city limits.

Two nonresident customers, in separate suits which were later consolidated for trial and appeal, sought to have the ordinance declared void. They also sought an injunction prohibiting the city from charging nonresident customers a rate in excess of that fixed for residents. In addition, they asked that the city be ordered to refund the amount of the rate increase charged and collected since passage of the ordinance. In each case, the plaintiff alleged that the provision of the ordinance increasing water rates for nonresidents was void because such rates were discriminatory, arbitrary, unreasonable, and excessive.

The consolidated cases were tried before the court without a jury. The evidence tended to establish the following basic facts: Grandview, a city of the third class, has operated a water system for domestic, commercial, and industrial purposes since 1911. The initial construction of the distribution lines and well was financed by general obligation bonds in the amount of eighteen thousand dollars, issued in 1911, and sixteen thousand dollars, issued in 1918. These bonds have long since been paid by means of special tax levies on property within the city. All extensions and improvements to the system since then, with certain exceptions noted below, have been financed by water, and water and sewer, revenue bonds. The total replacement cost of the entire system, as of the date of the trial, was $633,926.

In January, 1949, an ordinance was enacted setting a minimum rate of $2.50 for the first three thousand gallons delivered to a resident user. The ordinance established an additional thirty-cent charge above this minimum for nonresident users. The following year, plaintiff Swan J. Faxe, a nonresident, arranged to receive water service from the

city. He did so by bearing the cost of installing a lateral line and meter, connected to the city's Orchard Tract main. This main carried water from a well outside the city to the city water system. Other nonresidents similarly situated made like arrangements. The cost to the nonresident customers of installing these laterals ranged from one hundred dollars to $1,134. Plaintiff Chris Jenson, also a nonresident, purchased his property after the laterals were installed, but while the 1949 water rates were still in effect.

Between 1949 and 1952, a need developed for an expanded water supply to meet growing water requirements both within and without the city limits. In order to finance a new revenue bond issue for this purpose, city officials determined that rate increases were necessary. This led to the enactment, on June 3, 1952, of the ordinance here in question. This ordinance increased certain commercial rates. It did not change the minimum monthly rate of $2.50 for residents. For nonresidents, however, it provided that, in lieu of the thirty-cent surcharge previously in effect, there would be a minimum rate equal to one hundred fifty per cent of the minimum rate for residents. The effect of the ordinance was to raise nonresident rates from $2.80 a month to $3.75, while making no increase in the $2.50 minimum rate for residents of the city.

In enacting this ordinance, city officials relied largely upon the advice of the bonding company which handled the city's financing and of Don E. Gray, a consulting engineer employed by the city. The bonding company advised that the rate of $2.50 for a minimum supply for residents was a feasible maximum for service inside the city, and that any higher rate would reflect on the city's credit. A partial survey was made of the cost of delivering water to nonresidents. However, there was no analysis of the comparative costs of delivering water to residents and nonresidents.

In keeping with the advice of the experts, the 1952 ordinance was designed to provide one hundred fifty per cent of the revenue bond debt service, after paying the expense of operation and maintenance. The rates under the new ordinance yield to the city $1,881 more a year from the one

hundred sixty-five nonresident users than they paid prior to its enactment. The fifty per cent differential thus exacted from nonresidents of Grandview is to be compared to differentials ranging from twenty per cent to three hundred per cent by nonresident water customers of several other cities of Washington.

There are fifty-five fire hydrants within the city limits and one outside. Several of those within the city limits are across the street from nonresidents. Neither resident nor nonresident customers pay any additional water rate for standby service from these hydrants. The city fire hydrants and city fire department equipment have been used in fighting fires beyond the city limits, no charge being made for such service.

All mains and laterals, both inside and outside the city, are flushed by the city without charge. The city also performs certain repair and maintenance services without charge. It costs about 11.2 cents more per month to read the meters of nonresident customers than to read the meters of resident customers.

A connection to the city water system has the effect of increasing the value of the real estate served. Within the city, this redounds to the benefit of the city through increased assessed valuations for tax purposes. While the assessed valuation of real estate served outside the city is likewise increased, this does not financially benefit the city.

In the past, some overhead expenses attributable to the operation of the city water system have been paid out of the city's general fund. Among such items were salaries, insurance premiums, legal expenses, and a judgment. New accounting procedures have been established, however, under which this expense will hereafter be borne by the water department.

Upon this showing, the trial court entered findings and a decree favorable to plaintiffs. The court found and concluded that the increased nonresident rates and the provision of the ordinance effectuating such increase were "discriminatory, arbitrary, unreasonable, excessive," and therefore void. Enforcement of the ordinance was enjoined, and

plaintiffs obtained judgments against the city in sums equal to the amounts of the increase paid by them since passage of the ordinance.

The city appeals, challenging each of the quoted reasons given for declaring the ordinance void.

Appellant and respondents appear to agree that, in rendering water service to respondent nonresidents, Grandview is under a duty to fix rates which are just and reasonable, not unduly discriminatory, and not arbitrarily arrived at.

With regard to the fixing of rates which are just and reasonable, this duty is prescribed by statute. See RCW 80-.40.010 (Laws of 1951, chapter 252, § 1, p. 791).

With regard to the imposing of rates which are not unduly discriminatory, appellant predicates such duty upon Art. I, § 12, of the state constitution. This provision forbids the passage of any law granting special privileges or immunities. While agreeing that Grandview has such a duty, and apparently concurring in the view that Art. I, § 12, gives rise thereto, respondents also rely upon common-law principles as establishing such a duty.

The tests to be applied in determining whether the duty to fix nondiscriminatory rates has been breached are substantially the same, whether such duty is based upon the constitutional provision or common-law principles. Compare *State ex rel. Bacich v. Huse*, 187 Wash. 75, 59 P. (2d) 1101, with *Durant v. Beverly Hills*, 39 Cal. App. (2d) 133, 102 P. (2d) 759, and *Caldwell v. Abilene* (Tex. Civ. App.), 260 S. W. (2d) 712. We will therefore assume, without deciding, that such a duty exists by virtue of Art. I, § 12, of the state constitution.

The duty of Grandview to avoid arbitrary action in fixing such rates is implicit in the other named duties with which the city is chargeable.

The basic question presented on this appeal, therefore, is whether the city of Grandview breached any of these duties.

We will first consider the duty of Grandview to fix nondiscriminatory rates for water service to these nonresidents.

Art. I, § 12, of the state constitution, provides that no law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations.

The aim and purpose of this constitutional provision is to secure equality of treatment to all persons without undue favor on the one hand or hostile discrimination on the other. Compliance with this aim and purpose requires that the legislation under examination apply alike to all persons within a class, and reasonable ground must exist for making a distinction between those within and those without a designated class. *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P. (2d) 1101.

For the purpose of fixing rates, the 1952 ordinance placed nonresident water users in a class separate from resident water users. There is no contention or finding that the ordinance does not apply alike to all persons within the nonresident class. Therefore, under the rule of the *Bacich* case, *supra,* the finding of undue discrimination against nonresident water users is sustainable only if it appears that reasonable ground did not exist for classifying nonresidents separate from residents for rate-making purposes.

This brings us to a discussion of the grounds relied upon for making such a distinction. As in the case of all city-owned utility systems (and unlike privately-owned utility systems), Grandview constructed and now maintains and operates its water system primarily for the benefit of its own inhabitants. Citizens of the city, through financial contributions either in the form of taxes or rates in excess of operating expenses, have paid for the system. By the exercise of their elective franchise, such citizens have assumed responsibility for the management of the system. The general credit of the city has been a factor in the success of the enterprise. In many other ways, direct and indirect, the general city government has provided support and stability for the water system.

After the city and its citizens had gradually developed the water system over a period of nearly forty years, respondent

nonresidents sought and obtained permission to connect. They found the system a going concern. They were not required to assume any of the past burden or accept any future responsibility, save for providing a lateral connection and the payment of rates. While much of the system within the city is of no direct benefit to respondents, they could not have obtained service had not a financially sound utility been developed.

The cost of rendering service to nonresidents is greater than to residents. This is true not only in respect to the reading of meters, but also in the servicing and repair of lines. It is true that nonresidents, unlike resident users, have paid for their own lateral lines. It must be borne in mind, however, that such laterals remain the property of the nonresident customers and hence do not represent a capital contribution to the city system.

The city gains an indirect benefit from rendering water service to resident users in the form of higher property valuations. No such indirect benefit is realized from service to nonresidents. Other facts, some favorable to the city and some to respondents, have been considered, but are not discussed because they seem to about balance out.

In *Garretson Co. v. Robinson*, 178 Wash. 601, 35 P. (2d) 504, after referring to a number of constitutional provisions, including Art. I, § 12, we said:

"A legislative act is not violative of any of the constitutional provisions mentioned so long as the classification involved is reasonable and has a fair basis. It is generally held that the courts will not look too nicely into legislative acts to determine whether a reasonable distinction exists. A discrimination is valid if not arbitrary in the legislative sense, and a classification may rest on narrow distinctions." (p. 605)

The following statement, while made in discussing a city's common-law (as distinguished from constitutional) duty to fix nondiscriminatory rates, is also pertinent:

"It is well established that a municipal corporation operating its water works or other public utility has the right to classify consumers under reasonable classification based

upon such factors as the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use or any other matter which presents a substantial difference as a ground for distinction." *Caldwell v. Abilene* (Tex. Civ. App.) 260 S. W. (2d) 712, 714.

The amount of rate differential between two classifications of customers has no bearing on the question of discrimination. It is relevant only on the question of reasonableness of rates, to be dealt with below. As the court said in *Fox Point v. Public Service Comm.*, 242 Wis. 97, 7 N. W. (2d) 571:

"Once it is established that the services are different, a difference in the rates for each is immaterial so far as lawfulness is concerned. It may be of importance in the question of reasonableness, but that is not before us now." (pp. 102, 103)

Applying these principles to the facts of this case as summarized above, we conclude that Grandview had reasonable ground for establishing, for rate-making purposes, a separate class consisting of nonresident water users. We therefore hold that, in enacting the 1952 ordinance, Grandview did not breach its duty to fix nondiscriminatory rates for water service to respondent nonresidents.

Did Grandview, in enacting such ordinance, breach its statutory duty to fix "just and reasonable" rates for such service?

This court has not had occasion to construe or apply the term "just and reasonable," as used in RCW 80.40.010. However, a somewhat similar term, used in a general utility regulatory statute of the state, has received court interpretation. RCW 80.28.010 [*cf.* Rem. Rev. Stat., § 10362] provides that charges made by gas, electrical, or water companies, shall be "just, fair, reasonable, and sufficient." In *North Coast Power Co. v. Public Service Comm.*, 114 Wash. 102, 194 Pac. 587, we stated that this statutory provision meant that, all things considered, the charges shall not be so low as, among other things, to deprive the company of

means to render adequate service, nor so high as to unduly burden the public.

Substantially the same principle has been announced with reference to the duty of a common carrier to exact no more than reasonable rates. In *Puget Sound Elec. R. v. Railroad Comm.*, 65 Wash. 75, 117 Pac. 739, this court said:

"The carrier is entitled to adequate recompense for the service it performs. The individual is entitled to a rate that he can reasonably afford to pay for the service he requires." (p. 84)

The "adequate recompense" to which a private utility company is entitled is usually equated with a reasonable return on the investment devoted to a public use. See *State ex rel. Seattle v. Public Service Comm.*, 107 Wash. 17, 180 Pac. 913; *North Coast Power Co. v. Kuykendall*, 117 Wash. 563, 201 Pac. 780; *State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service*, 19 Wn. (2d) 200, 142 P. (2d) 498.

The statement in Dillon on Municipal Corporations concerning the duty of a municipality, irrespective of statute, to charge resident consumers no more than a reasonable rate, is also helpful here. It is there stated:

"No exact rule can be laid down which is applicable to all cases. Each case must be decided upon its special facts as it arises. The interests of the corporation and of the public in the determination of the question require that it be viewed from opposite standpoints, and two controlling considerations have been laid down representing the opposing interests to which all others are subordinate. As to the public, a reasonable rate is not higher than the services are worth to them, not in the aggregate, but as individuals. From the standpoint of the public, the value of the services is to be considered and not exceeded. As to the corporation rendering the services, a reasonable rate is such as gives it a fair compensation for the services rendered, yielding a fair return to it upon the value of the property as a going concern used for the public at the time it is being used." (3 Dillon, Municipal Corporations (5th ed.), 2265, § 1330.)

The statement just quoted fairly expresses the meaning to be attached to the statutory requirement (RCW 80.40.010) that "just and reasonable" rates be fixed for non-

resident water service. It should be added, however, that some reasonable discretion must abide in the officers whose duty it is to fix rates, and unless the courts can say, from all the circumstances, that the rate fixed is an excessive one and disproportionate to the service rendered, the judgment of the officers fixing the rate must stand. *Twitchell v. Spokane*, 55 Wash. 86, 104 Pac. 150.

■ Rates established by a municipality for utility service to inhabitants are presumptively reasonable. *Detroit v. Highland Park*, 326 Mich. 78, 39 N. W. (2d) 325; *Durant v. Beverly Hills*, 39 Cal. App. (2d) 133, 102 P. (2d) 759. It follows that one who challenges such rates as unreasonable has the burden of proof. *Port Orchard v. Kitsap County*, 19 Wn. (2d) 59, 141 P. (2d) 150; *Louisville & Jefferson County Metropolitan Sewer Dist. v. Joseph E. Seagram & Sons*, 307 Ky. 413, 211 S. W. (2d) 122, 4 A. L. R. (2d) 588. We see no reason why the same principle should not apply with regard to a challenge to the reasonableness of nonresident utility rates.

Appellant contends that respondents did not maintain that burden of proof, and it was therefore error for the court to find and conclude that the rates in question were unreasonable.

While it costs more to read nonresident water meters than it does to read resident meters, such additional cost would account for only a fraction of the difference between resident and nonresident rates. When other direct and indirect costs are taken into consideration, the margin is considerably narrowed, but is still probably insufficient to account for the difference in rates.

The full explanation for the difference between resident and nonresident rates probably requires consideration of another factor. In 1952, it became necessary to raise additional revenue. Financial experts advised the city officials, however, that resident rates had already reached a maximum, in so far as sound and economic financing of the system was concerned. It was therefore necessary to seek the additional revenue in other directions. As a consequence,

the 1952 ordinance increased commercial and nonresident domestic rates.

Had it not been for the impracticability of raising resident domestic rates in 1952, it is entirely likely that higher resident rates could have then been fixed, without departing from the zone of reasonableness. At least there is no showing to the contrary. It follows that the rate level which was maintained for resident rates does not provide a reliable yardstick as to the maximum reasonable rate, either within or without the city.

■ For these and other reasons, proof of a rate differential in favor of residents does not make a *prima facie* showing that nonresident rates are unreasonable. *Detroit v. Highland Park,* 326 Mich. 78, 39 N. W. (2d) 325; *Durant v. Beverly Hills,* 39 Cal. App. (2d) 133, 102 P. (2d) 759.

■ Considerable evidence was received concerning industrial water rates within the city of Grandview and the rate paid by a city official for standby sprinkling system service. A comparison of such rates with those for nonresident domestic service is not helpful. The services are of an essentially different character. It is not questioned that the city may classify industrial and standby services separate from domestic service for rate-making purposes. The classification being proper, the proportion of required revenue which is assigned to each class is a legislative function. It is not subject to court review, unless the resulting rate to the complaining party is unjust and unreasonable under the test set out above.

Respondents made no showing whatever concerning the two basic factors to be considered in determining the reasonableness of nonresident rates for municipal utility service. They produced no evidence concerning the value of the service to themselves. Nor did they present a case concerning the return being received by the city on the investment devoted to nonresident service.

■ We conclude that respondents did not maintain the burden of proving that Grandview breached its duty to fix

just and reasonable rates for water service to respondent nonresidents.

 It remains to be determined whether Grandview, in enacting the ordinance, acted arbitrarily. As before stated, a duty not to act arbitrarily in fixing water rates for nonresident service is implicit in the other duties which have been under discussion.

In considering and acting upon the 1952 ordinance, city officials had the benefit of expert advice supplied by a consulting engineer and a financial expert. The action taken was consonant with the advice received.

Certain costs studies were made, though no comparative analysis of resident and nonresident costs of operation was undertaken. The need of additional revenue and the specific rate schedule set out in the ordinance were fully discussed and considered by the officials who had legislative and administrative responsibility for the system.

In view of this showing, there is no basis for the finding and conclusion that the city acted arbitrarily. See *State ex rel. Public Utility Dist. v. Schwab*, 40 Wn. (2d) 814, 246 P. (2d) 1081.

In our consideration of the question of whether Grandview has breached its duty to fix just, reasonable, and nondiscriminatory rates in a nonarbitrary manner, we have not overlooked the cases cited by respondents.

The case most heavily relied upon is *Montgomery v. Greene*, 180 Ala. 322, 60 So. 900. It was there held that "a different rate, fixed wholly upon the corporate lines as the line of demarcation, in the absence of physical differences," was an unreasonable classification. While this language tends to support respondents' position, the fact is that such language is broader than was necessary to support the result reached. No factors of difference, such as cost of operation, capital contribution by the inhabitants of the city, impracticability of raising resident rates—all present in the instant case—were alleged or proved.

It also should be noted that, contrary to the implications of the *Montgomery* decision, there is inherent in the sepa-

rate classification of nonresidents for municipal rate purposes more than a geographical demarcation. The city boundary line, at the very least, divides those customers (inhabitants of the city) for whose primary benefit the system was constructed, from those who have no such claim. The city boundary line also usually serves to divide those customers who have made a capital contribution to the system, who have assumed responsibility for its operation, and who have, through general municipal functioning, contributed to its support and development, from those who have not.

In this connection, see *Louisville & Jefferson County Metropolitan Sewer Dist. v. Joseph E. Seagram & Sons,* 307 Ky. 413, 211 S. W. (2d) 122, where the court sanctioned a higher nonresident rate, on the ground that the inhabitants of the city were the owners of the system, and the nonresidents were not.

The other cases cited by respondents, while containing some language favorable to respondents' position, are not in point. *State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service,* 19 Wn. (2d) 200, 142 P. (2d) 498, did not involve a municipal utility. *Malvern v. Young,* 205 Ark. 886, 171 S. W. (2d) 470, did not involve nonresidents. *Fox Point v. Public Service Comm.,* 242 Wis. 97, 7 N. W. (2d) 571; *Texarkana v. Wiggins,* (Tex. Civ. App.) 246 S. W. (2d) 622; and *In re Muscoda,* P. U. R., 1930D 8, involved statutes which, in effect, placed municipal utilities in the same position as privately-owned utilities.

The *Texarkana* case, moreover, dealt with a special situation, where the city had purchased a private utility system already serving nonresidents. In addition, it should be noted that in that case four judges joined in a dissenting opinion which declared that the conclusion reached by the majority "is contrary to the overwhelming weight of authority."

In three of the cases cited by respondents (*Louisville, Fox Point,* and *Muscoda*), the result actually reached was to sanction higher rates for nonresidents.

The following decisions, while concerned primarily with the question of basic duty, contain language tending to sup-

port the view herein expressed, that Grandview has not, under the established facts, breached its duty to respondent nonresidents. *Childs v. Columbia,* 87 S. C. 566, 70 S. E. 296; *Davisworth v. Lexington,* 311 Ky. 606, 224 S. W. (2d) 649; *Phoenix v. Kasun,* 54 Ariz. 470, 97 P. (2d) 210, 127 A. L. R. 84; *Louisville & Jefferson County Metropolitan Sewer Dist. v. Joseph E. Seagram & Sons, supra.*

Reversed.

MALLERY, HILL, WEAVER, and ROSELLINI, JJ., concur.